**RYAN KATZENBACH & DIANA MAIOCCO**
c/o DIANA MAIOCCO
**4935 Beverly Boulevard, Apt 16**
**Los Angeles, California 90004**
**TELEPHONE: (323)681-1894**
**EMAIL:      ryan@amityvillefilm.com**

FILED

2016 OCT 28  PM 3: 22

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

**PLAINTIFFS IN PROPRIA PERSONA**

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

**RYAN KATZENBACH and DIANA MAIOCCO,**
individuals;

       Plaintiffs,

       -vs.-

**GAIL BLECKMAN, an individual;**

       Defendant.

**CASE# ACV 16 - 08060-PSG(JEM)**

**COMPLAINT FOR**
**DECLARATORY RELIEF**

PAID

OCT 2 8 2016

Clerk, US District Court
COURT 4612

LA
144696

For their Complaint against defendant, plaintiffs state as follows:

## I. THE PARTIES

1.    Plaintiff Ryan Katzenbach ("Katzenbach") is a California based independent documentary and filmmaker producer, writer and director whose principal headquarters and place of business is in California.  Katzenbach's business is actively engaged in worldwide production and distribution of films.

2.    Plaintiff Diana Maiocco ("Maiocco") is an independent documentary and film producer based in California.  She served, from 2005, until 2015 as a business partner to Katzenbach specifically for the production of a documentary series on the infamous Amityville Horror murder case.

3.    Defendant Gail Bleckman ("Bleckman") is an individual.  On information and belief, Bleckman resides in the State of California and is represented by California counsel, S. Michael Kernan of Beverly Hills.

## II. JURISDICTION AND VENUE

4.     This is an action for a declaratory judgment in favor of Katzenbach and Maiocco ruling that they have not infringed, cannot infringe, and will not infringe any copyright allegedly owned by Bleckman because Defendant does not actually own such copyright; that Bleckman's claims for breach of a 2010 oral contract to serve as a producer on their Amityville project with Katzenbach be ruled null and void because of the actions she has taken, or lack thereof, against Katzenbach and Maiocco; and that any claim for breach of said oral agreement is barred by statute of limitations for Bleckman's failure to bring this action in a timely manner pursuant with California law.

5.     On information and belief, Bleckman is a resident of the State of California and conducts business directly and through legal representatives in the State of California and within this judicial district. Bleckman has informed plaintiff's, via her Santa Monica attorney, that she plans to litigate them here, and within this very Court.

6.     The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

7.     This Court has jurisdiction over the subject matter of this action pursuant to Title 28 U.S.C. § 1338 (Copyrights).

8.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391.

## III. BACKGROUND

9.     In November 1974, Ronald DeFeo Jr., took a high powered rifle and executed his entire family in their home in Amityville, Long Island, New York. A year after their murders, at approximately the time that DeFeo was convicted of the crime, his family's former home was sold to the Lutz family. Twenty-eight days after moving in, the family fled declaring that they could not live in the house due to horrific supernatural and demonic forces that dogged their daily existence.   The Lutzes, in 1977, went on to publish a book entitled *The Amityville Horror*. The book became a runaway bestseller and has, literally, spawned a horror franchise that, to this day, continues to grip the American pop-culture.

10.     From a young age, Plaintiff Katzenbach was fascinated with the Ami-

COMPLAINT FOR DECLARATORY RELIEF
KATZENBACH V. BLECKMAN
COMPLAINT                                                                          2

tyville story. In his late 20's, he endeavored to make a film that focused on the original DeFeo murders addressing forensic questions surrounding the case. From 2001 he optioned rights to a book on the subject, and from 2003 through 2005, he was engaged in an active development deal with Sony Pictures Television for a "movie of the week." When Sony pulled out of the effort at the end of 2005, he decided to move forward independently with a docudrama for which he would write, direct and produce. On January 16, 2006, Katzenbach commenced filming what would become his docu-series, *Shattered Hopes: The True Story of the Amityville Murders.*

11. From January 2006 up until 2010, Katzenbach was actively involved in research, traveling for interviews with various figures involved with the case, the assemblage of a forensic analysis team, and filming extensive recreations with a cast of actors that focused on the DeFeo family. Katzenbach, during 2010, even went so far as to build a replica, in half scale, of the DeFeo's infamous "Amityville Horror" house as it looked in 1974 for the sake of maintaining accuracy. By the time 2010 rolled in, the film was, for all practical purposes, completely shot.

12. In late 2005, just as his Sony deal was coming to a close, and as the project was going into "turnaround" and, hence, just before the filming of *Shattered* began, Katzenbach was introduced, via a mutual industry friend, to Diana Maiocco. Maiocco eventually, by the spring of 2006, came aboard the project to assist Katzenbach in the production of the film. Contributing financial resources and assistance to the project, Maiocco would eventually come to serve as the project's Executive Producer and unofficial secretary-treasurer, while she and Katzenbach continued to split the costs of making the project out of their pocket.

13. In approximately spring 2010, Maiocco, a breast-cancer survivor, was introduced to Defendant. Bleckman was allegedly producing a TV series pilot about cancer survivors when a mutual acquaintance introduced them. Bleckman convinced Maiocco to sit for an interview in Bleckman's pilot which was supposed to air on the Ion Channel but never eventuated. Maiocco was, initially, very impressed with Bleckman and found her to be a genuine, professional person. As a result of this, she wanted Katzenbach to meet her and thought that Bleckman might bring some value to their various projects.

**COMPLAINT FOR DECLARATORY RELIEF**
**KATZENBACH V. BLECKMAN**
**COMPLAINT**                                                                          3

14.     Katzenbach met Bleckman on or about the 8th or 9th of May, 2010 while in Los Angeles. Katzenbach was producing and directing the reading of a screenplay that he wrote entitled *Back of Book* as a staged reading at Garry Marshall's Falcon Theatre in Burbank as a one-night event on May 10th. Maiocco brought Bleckman to the rehearsals, where he was directing a whole cast of actors. Almost immediately, Bleckman began spewing ideas about people she claimed she could get involved and possible avenues to secure financing to make the film, though Katzenbach, at first was very reserved in his belief that she could actually do so.

15.     Representatives of General Motors attended the event. (The screenplay is a comedy set within the car business.) GM later asked for a business plan (known in the industry as a "deck"). Bleckman convinced Katzenbach that she could help him prepare this financing and business plan for GM. In exchange, if the venture was successful, and Katzenbach were able to secure financing for *Back of Book*, as a movie, then she would be included in the project as a producer. Katzenbach agreed. The deck was submitted and, eventually, nothing would ever become of this endeavor. To date, the film has never been made and Bleckman played no further role, aside from assisting Katzenbach with some text that appeared in the deck, and has never secured any financing or talent for the *Back of Book* project.

16.     The same weekend as the reading, approximately May 11-12, Maiocco, Katzenbach and Bleckman went to dinner at a restaurant at Universal City Walk in Los Angeles. Over dinner, Bleckman expressed her strong desire to participate in Maiocco and Katzenbach's Amityville venture. Bleckman, a New York native, at this point, was still living on Long Island, and at the point they were meetings, was visiting Los Angeles. She was heading back to Long Island in June or July to close up her residence and move back to California.

17.     During the time that Bleckman remained in California before departing for New York, she continued conversations with Maiocco and Katzenbach. Katzenbach had a desire to obtain assistance on Long Island in obtaining some documentation from Suffolk County. Though the film was nearly "in the can," he did still have a desire to revisit a few issues. Up to this point, Suffolk County Police Department ("SCPD"), who had investigated the original DeFeo murder case, had been stonewalling Katzenbach's information requests. Katzen-

1  bach, that spring, had actually advertised for some freelance help in New York with research and

2  videography (Exhibit "A") and had been talking to at least one or two people prior to meeting

3  Bleckman. However, it was decided, eventually, by Maiocco and Katzenbach, as business part-

4  ners, that if Bleckman were enthused about the project, perhaps she could be their "person on the

5  ground" since she was, after all, going back to her native Long Island anyway. It was decided

6  that Bleckman would be brought about the project as a "Producer" on a freelance basis.

7          18.     Bleckman's duties were to be two-fold. First, because she maintained

8  that she had strong relationships with Lions Gate and other distributors, she would spearhead

9  the effort to obtain distribution for the film, which, as of that date, had been shot on "spec" -- an

10  industry term that means the film is being shot without any financial backing or any commitment

11  to distribution in the hopes of eventually being picked up. Her second duty would be to help

12  Katzenbach, and work at his discretion, on the task of trying to squeeze additional documentation

13  out of Suffolk County --- specifically, the SCPD's actual homicide file on the DeFeo case. To

14  date, there had been small pieces of the file released to the public. But, no one had ever seen the

15  whole file. Katzenbach was hoping that he could force the release.

16          19.     It was agreed, at this time, that Bleckman would receive 3% (three-percent)

17  of the gross revenue from *Shattered Hopes* less any sales commissions and other industry-standard

18  costs. Bleckman would, later, and unilaterally, recall that it was 5% (five-percent) despite the fact

19  that Maiocco and Katzenbach both distinctively remember very differently. However, due to the

20  eventual success Bleckman had in getting the files from SCPD, Maiocco and Katzenbach never

21  raised exception to this and went ahead and agreed to the 5% stake. It was understood, from the

22  beginning that the agreement was to be an oral one which would be reduced and memorialized in

23  writing to a formal contract at a later date when Katzenbach had time to prepare such document.

24  And, it was further understood, that the percentage was not a true "first dollar" deal since there

25  are always expenses endured by the producers of a film that must be recooped. Katzenbach and

26  Maiocco have religiously, via every agreement of this nature executed, provided a computation

27  as to how "gross" is defined. Gross, upon which Bleckman's royalty would be computed, is de-

28  fined as "gross" less sales commissions, advertising, and returns would then equal the adjusted

gross upon which her commission would be derived. Plaintiffs submit, as an example, Exhibit "B" which is but one of the executed agreements from the project.   Furthermore, Katzenbach and Maiocco were also clear and concise to Bleckman that they had a "First 50" clause in all agreements executed, which meant that the first $50,000 U.S.D. derived from the project would be exempt from royalty payment as this money needed to go to Katzenbach and Maiocco who had, even at this point in 2010, spent well beyond $50,000 out of pocket making the film. The clause was worked into the agreement in hopes that the two producers would  enjoy some form of recoupment of their money.

20.    Bleckman did, eventually, sometime in July or August return to Suffolk County, New York to close up her house and begin the process of moving to Los Angeles.  It was during this time that she began working on the Amityville project under the terms of the oral agreement that had been made.  And, almost immediately the conflicts began.  Upon an initial visit to the SCPD, Bleckman encountered an old acquaintance -- an SCPD officer, "Jim" -- whom she had known previously.  Sometime, immediately after this, she began telling Katzenbach, via telephone and other means, that she was "interested" in Jim.  Katzenbach implored Bleckman not to become involved with this "high ranking and highly decorated" (Bleckman's words) officer during the investigation stage of his documentary.  He explained that IF she became romantically or sexually involved, it could lead to questions about his and Bleckman's ethics.  Bleckman pushed back against Katzenbach and told him that this was none of his business; that she had the right to do whatever she wanted.  Katzenbach worried that, later, if documents were obtained from SCPD and the department were to look bad in light of those documents, accusations would be made that Bleckman had used the SCPD officer to obtain these records. (Exhibit "C") Katzenbach also worried that, if the relationship went "bad" that the officer could use his influence to block Bleckman from obtaining documents. Telling her that this was a questionable ethics issue, Bleckman refused to comply and pursued a relationship with Jim anyway with utter disregard to her fudiciary duties to the project. And this wouldn't be an isolated case wherein Bleckman proved she cared far more about her own profiting than she did the project.

21.    During the fall of 2010, Bleckman remained on Long Island for far longer

than she had originally anticipated. Emails between Katzenbach and Bleckman substantiate that, during this time, she was working on other projects and at other jobs while also endeavoring to get SCPD to release the various DeFeo documents. At no time was she working exclusively or full time for Katzenbach and Maiocco; at no time were the two California partners imposing any deadlines or restrictions upon her. She has come to contend that she spent $12,000 - $15,000 out of her own pocket to work on the Amityville project; however, at no time, during this time, did Bleckman express such expenses to Katzenbach and Maiocco. Plaintiffs reason that these were her basic living expenses she endured while participating in other projects in New York during the time she was there and they cannot be held liable for these expenses since she was endeavoring in other projects, which may have prolonged her New York stay at Bleckman's discretion at all times. (Exhibit "D")

22.     During the fall of 2010 and into 2011, Bleckman was successful at obtaining some documents from the DeFeo case; at all times the producers paid for any and all copying, replication, CD or DVD duplication costs. Consideration and reimbursements paid to Bleckman for any expenses are broken down in Exhibit "E."

23.     One of the records that Bleckman obtained while under the oral agreement with Plaintiffs was that of the SCPD homicide file. This file was delivered to Katzenbach in California, via mail, from Bleckman who was still, as of January 2011, in New York. Katzenbach spent the next few weeks scouring the homicide file and accompanying crime scene photos, at which point he arrived at a conclusion. Ronald DeFeo, the convicted murderer, has claimed for over 4 decades that there was a second murder weapon -- a .38 handgun -- involved in the commission of the crime. Based on a few documents and some material contained in the file, for which Katzenbach hadn't previously seen, Katzenbach ultimately came to the conclusion that the weapon wasn't just a 'tall tale' of DeFeo; that it did actually exist, and that he felt he now knew where this weapon was at --- that it had been tossed on the morning of the crime in a canal at the Coles Street dock in Amityville.

24.     Katzenbach relayed his thesis to both partner Maiocco and Gail Bleckman, as well as other parties, too sometime between February and April. Both were very excited

to hear this thesis and Bleckman asked what Katzenbach planned to do with the information. They discussed the possibility that the gun was still at the bottom of the canal. Over the next few weeks, and with further discussions, Bleckman reached out on Long Island to see if she could, on behalf of Katzenbach, find a diver to talk over feasibility of a search for the gun. She reported back, in April, that she had been referred to a Long Island diver by the name of Bill Pfeiffer. On April 21, 2011 at 8:48 a.m., Bleckman forwarded Katzenbach a couple of messages from Pfeiffer (Exhibit "F") and states: "Response from Bill... let me know how you'd like to next approach this... thanks!" The response is important because it clearly demonstrates Bleckman's deferral to Katzenbach for directives and orders.

25. Katzenbach immediately began speaking directly with Bill Pfeiffer and the two began discussions to hire a company called AquaSurvey, ("AS") based in Flemington, New Jersey to assist in an electromagnetic scan of the canal to determine the possibility that a handgun was buried at the bottom of it. Ultimately, Katzenbach would contract with AS and pay thousands of dollars to the firm to conduct the survey, while also negotiating with Bill Pfeiffer and his team who would serve as the search and recovery divers once the survey mapped where metallic objects were located. For the most part, Bleckman was largely absent from any of these discussions, negotiations or arrangements as this was Katzenbach's thesis, and Katzenbach's decision as to how to execute. Katzenbach would frequently report back to Maiocco and Bleckman as to the progress being made.

26. Because Katzenbach was in California, he couldn't be present for all dive operations, Gail Bleckman suggested her friend, John Collins, as a videographer to shoot tape for the documentary effort. Katzenbach agreed, and throughout the dive operations, Collins and another videographer, Bjorn Kils would be employed on a freelance basis a total of four times. Diana Maiocco wrote checks to these individuals or transferred money to Gail Bleckman to pay them via her Bank of America account, which are included within Exhibit "E." It was understood at all times that the footage was the property of Katzenbach and Maiocco, who split the cost of these expenditures. After payment was made, Collins and Kils forwarded the tapes they had shot to Katzenbach for inclusion within the film.

27. In March, and sandwiched between the discussions of the lost murder weapon, Bleckman was notified that a FOIL request filed on behalf of the project had been approved and that Bleckman was being permitted into the Property Division to film actual evidence from the DeFeo homicide. Recalls Katzenbach, this was somewhat last minute and there was a scramble to make arrangements to find a videographer; at the same time, Bleckman was planning to leave New York to come back to California right around this time. Adjustments to schedule had to be made, and Bleckman reported that she had a videographer a day before the shoot was scheduled. The cost of the videographer was to be $200.00 for the session, and the videographer needed to be paid on the day of the shoot. Thus, Diana Maiocco transferred, from her BofA account to Gail Bleckman's account, $200.00 on March 4th, 2011. This record is included in Exhibit "E." It is presumed that Bleckman paid the videographer in accordance with the terms agreed upon by Katzenbach. Gail Bleckman delivered, when she arrived in California, to Katzenbach, the tape from the shoot at SCPD's Property Division. It was clearly understood that this tape was to be part and parcel of the film; that the tape was the property of Maiocco and Katzenbach who had paid for the creation of the tape.

28. The shoot at SCPD Property Division had encompassed video of many items of evidence from the homicide case. The most important item that Bleckman was told to focus on was that of murder victim Dawn DeFeo's nightgown which Katzenbach had specifically told Bleckman to include in the FOIL request. She did so, and was entremely angry because the nightgown of Dawn DeFeo's was sealed and marked as a "bio-hazard" due to some blood on it. Therefore, she wasn't able to examine the nightgown for evidence that Katzenbach was specifically looking for. After Bleckman was back in California, Ryan Katzenbach and Bleckman discussed a request to ask Suffolk County for a redux of the nightgown shoot. It was Bleckman that penned a letter to SCPD's Chief Medical Examiner, Yvonne Milewski, M.D., seeking such an examination of the garment. The letter, dated March 21, 2011 is attached as Exhibit "G." Within the letter, Bleckman uses terminology such as "It is our position at Katco Media..." and identifies herself as a producer working for this documentary effort. She does not indicate to the M.E.'s office that she is some independent, sole person working on a project by herself. She

1    very, very clearly represents the Plaintiff's project as being the film she is working on.

2          29.    In January 2012, after several dives, and many battles along the way with

3    Suffolk County and the Village of Amityville, Plaintiff's dive and survey team were permitted

4    back into the water off the Coles Avenue Dock in Amityville to resume their search.  On Janu-

5    ary 19, the team did, in fact, recover a .38 handgun from the bottom of the canal in the vicinity

6    of where it was felt by Katzenbach that DeFeo had tossed the gun in the early morning hours of

7    November 13, 1974.  The gun was confiscated by the Suffolk Police Department on the spot.

8          30.    After January of 2012, Bleckman began to fade into the background as

9    research and active work on the film shifted from a principal photography stage to that of a post

10   edit process.  The first installment of *Shattered, Part I, From Horror to Homicide* was released

11   on December 16, 2011 on DVD.  Katzenbach was busy, at this point, working feverishly on the

12   second and third installments.  It must be noted that Bleckman and Katzenbach had, verbally,

13   agreed to Bleckman's on-screen credits in the film.  She was to receive a "Producer" credit, as

14   well as an "Additional Research" credit.  These credits were included in all installments of the

15   film up to the present date in accordance with the terms of Bleckman and Katzenbach's verbal

16   agreement and willingess to perform upon the agreement made.

17         31.    Between 2011 and 2012, Katzenbach and Maiocco began to hear some

18   rather discerning statements circling back to them from various parties.  Bleckman was actively

19   involved in badmouthing the project and the partners; she was telling others, such as Bill Pfeiffer

20   and another producer, Keith Knee, that Katzenbach was incompetent as an editor, among many

21   other disparaging things.  She was also disclosing sensitive business information about the film

22   to others.  Ryan Katzenbach, infuriated over Bleckman's actions, essentially distanced himself.

23   Plaintiff's can present declarations and witnessess at hearing who can testify as to the things

24   Bleckman was saying.  When Bleckman had arrived in California in 2011, she had no job, no

25   income, no savings and no car.  Plaintiff Maiocco graciously allowed Ms. Bleckman to stay at her

26   apartment until such time that Bleckman could obtain gainful employment and secure an apart-

27   ment.  However, as the relationship deteriorated between Maiocco-Katzenbach and Bleckman, it

28   was in January 2012 that Maiocco insisted that Bleckman move out of her apartment.

32.     Up until this point, in January 2012, Bleckman had been working under the verbal summer-2010 agreement that they had made. It had long been understood, as a term of the verbal agreement, that said agreement would be memorialized to a written contract. Bleckman began pushing on Katzenbach for such agreement throughout the spring of 2012. Katzenbach, admittedly, did not get to the document right away. After numerous and often tempestuous emails back and forth, Katzenbach did, finally, have time to memorialize their agreement to written contract form. In October 2012, Katzenbach did deliver the contract, as a PDF, and via email, to Bleckman. Bleckman, who had been a tremendous huff over the agreement and had been threatening Katzenbach with legal action for breach did not respond with anything other than email on October 24, 2012 wherein, more than a week after receiving the contract, she says "I need to set aside some time for review...Will get to it." Emails and communications between Bleckman and Katzenbach are contained in Exhibit "H," and pertinent passages are highlighted.

33.     It should be noted, at this time, that Bleckman began threatening to release Katzenbach's materials, while making assertions that she owned all the materials in the film. Katzenbach, in turn, responded very firmly and very clearly telling Bleckman that this is not true and Bleckman, believes Katzenbach, knows this to be a fact but wishes to now use to assert copyright infringement claims as a means of extortion.

34.     Katzenbach and Maiocco did not hear from Bleckman during the entire course of 2013. No phone calls, no emails, no communication whatsoever. Katzenbach and Maiocco believed that Bleckman had gone back to New York after she moved from Maiocco's apartment.

35.     At the end of 2012, around the time that Katzenbach delivered the contract to Bleckman, Katzenbach also released the second installment of the docuseries - *Shattered Hopes, Part II: Mob. Mayhem. Murder*. In July 2013, Katzenbach released half of the third and final installment, *Fraud & Forensics*. Additionally, in 2014, out of the blue, he and convicted murderer Ronald DeFeo were in touch. DeFeo agreed to an interview with Katzenbach, and in June 2014, that interview was conducted at Green Haven Correctional Facility. Part of that in-

1  terview was ultimately released online as a "supplemental" piece to the *Shattered* series entitled

2  *75-A-4053: Interviewing the Amityville Horror Murderer*.

3       36.     In June 2014, Reelz Channel, a Hubbard Broadcasting network reached

4  out to Katzenbach and Maiocco and sought to make a deal for a condensed 2-hour version of

5  their docudrama series. A licensing agreement was reached, and a 2-hour special was debuted

6  in October 2014. The deal allowed Katzenbach and Maiocco to recoup some of the money that

7  they had spent making the film, though the deal absolutely did not make them whole. After the

8  debut of the condensed version, entitled *High Hopes: The Amityville Horror Murders*, Bleckman

9  miraculously remembered the Plaintiff's contact info and her threats for legal action and refusal

10 to execute the written agreement surfaced again.

11      37.     On October 30, 2014 --a little over two years after the delivery of the writ-

12 ten contract to Bleckman wrote, at this point, in an effort to "figure out where we are, in terms of

13 the Amityville project, and contract, etc."  Katzenbach replied that all she had to do was execute

14 the contract and submit corresponding tax documentation required to pay her, and that he would

15 issue a royalties check. She refused to execute the agreement and wished to renegotiate terms.

16 Plaintiff Katzenbach and Maiocco felt it ridiculous that Defendant was (and still is), two years

17 after the fact, now trying to change the terms of the verbal agreement. This exchange is included

18 as Exhibit "I."

19      38.     Bleckman, in her typically vindictive and spiteful fashion, went to Reelz

20 Channel where she spoke to Rob Swartz, a network development executive. Bleckman wrote to

21 Swartz on November 10, 2014 and alleged that "I do not have any current contact information"

22 for Katzenbach. This is a flagrant lie as Bleckman had been in touch with Katzenbach via email

23 a week or so earlier and had told her to send whatever she needed to send as an email, while also

24 telling her to have her attorney contact him if, in fact, she actually had an attorney.  The network

25 forwarded the email to Katzenbach who advised them of this ongoing situation. Email commu-

26 nication with Reelz Channel is included as Exhibit "J."

27      39.     Bleckman disappeared again, and Katzenbach would have no communi-

28 cation with her until mid-2015. Even in light of the hostilities, in February, Reelz nominated

**COMPLAINT FOR DECLARATORY RELIEF**
**KATZENBACH V. BLECKMAN**
**COMPLAINT**                                                                  12

1  the Amityville documentary for an Emmy nomination.  As part of the submission process, Kat-

2  zenbach and Maiocco made sure that Bleckman was named as a producer and would receive

3  appropriate recognition if they won the official nomination.  This was done in an effort to act in

4  good faith.  Exhibit "K."

5        40.  Bleckman surfaced in the summer, again contacting Reelz, but, this time,

6  contacting CEO Stanley Hubbard's office.  Ryan Katzenbach, again, wrote to Bleckman on July

7  8, 2015, copying an executive from Reelz, and instructed her to sign her agreement and that he

8  would issue a royalty payment and that she was to cease and desist from further contact with the

9  network.  Again, Bleckman refused to respond.  Exhibit "L."

10        41.  On August 31, 2015, New York attorney Philip Wild contacted Katzen-

11  bach now asserting that he was representing Gail Bleckman.  Thirty-four months after present-

12  ing Bleckman with a contract, she is now, via Wild, proposing extensive red-line modifications.

13  Bleckman is removing language that she agreed to in the verbal agreement; she is trying to strike

14  confidentiality riders because she knows she violated every one of them through her disclosures

15  to others; she's placing audit demands upon Katzenbach wherein he has to turn over massive

16  amounts of financial records to outsiders.  Plaintiffs reviewed the proposed changes and rejected

17  them in entirety.  Katzenbach made it very clear to Wild that he would not entertain the changes.

18  Wild, in turn, promised to sue Katzenbach and the project for copyright infringement.  Katzen-

19  bach replied, in his final email, on September 8, 2015 with "Do what you feel you need to do."

20  All of the Katzenbach/Wild emails are attached as Exhibit "M."   After this email, Plaintiffs

21  never heard from Wild or Bleckman again.

22        41.  On Thursday, October 20, 2016, after not hearing from Bleckman and

23  receiving no further correspondence from attorney Phil Wilde of New York since the previ-

24  ous September, Katzenbach received a series of emails from Beverly Hills, California attorney

25  Stephen Michael Kernan.  Kernan now asserts that he is the attorney of record for Bleckman

26  and demanded that Katzenbach remit payment to Kernan for Bleckman's royalties.  Kernan as-

27  serts, now, that Katzenbach and Maiocco have infringed Bleckman's copyrighted intellectual

28  property.   As an attachment to the email, Kernan has attached a full copy of a civil complaint

1  that he intends to file before this very Court. The Kernan documents and emails are attached for

2  the Court to review as Exhibit "N." Kernan is demanding, at this point, payment not less than

3  $1.5M for the alleged copyright infringement that he claims the Plaintiff's have engaged.  In

4  subsequent exchanges since his initial email, Kernan refuses to listen to any reason or fact that

5  supports the notion that the work Bleckman is alleging Katzenbach infringed was paid for by

6  Katzenbach. Plaintiffs are forced to file this action before this Court.

7  <div align="center">**IV. CLAIM FOR DECLARATORY RELIEF**</div>

8      42.  As alleged and more thoroughly described in the Background pleading

9  just set forth, Plaintiff's are in receipt of S. Michael Kernan's demand letter for $1.5 million

10  U.S.D. on behalf of Bleckman, as well as a written copy, inclusive of all exhibits, that he intends

11  to file on the behalf of his client, Gail Bleckman. It is from this document -- the exact instrument

12  that Defendant Bleckman intends to file -- that Plaintiff's make their claim for and complaint for

13  declaratory relief before this Court.

14      43.  A judicial determination of the parties' rights and obligations is necessary

15  in order to avoid irreparable harm to plaintiffs Katzenbach and Maiocco.  Plaintiffs, at present,

16  have no adequate remedy at law.

17      44.  A lawsuit filed by Bleckman will cause immediate and irreparable harm to

18  Plaintiff's Katzenbach and Maiocco in the form of financial damage resulting from the defense

19  of a frivolous lawsuit that has no merit.

20      45.  Plaintiffs will suffer irreparable harm if Defendant files her lawsuit to their

21  reputation and the relationships that they enjoy with other third parties, namely networks like

22  Reelz Channel, Hubbard Broadcasting, and Amazon, upon which their films are distributed and

23  for which Bleckman has named as Defendants in her action.  Even if this meritless lawsuit is

24  tossed out of this Court, networks and other entities do not want to do business with producers

25  who land them in costly lawsuits. Bleckman is banking on this, as well as Counselor Kernan as

26  a means of obtaining a fat "payday," and their vindictive, cavalier and capricious behavior must

27  be put to a stop.

28  ///

### FIRST CLAIM FOR RELIEF
### CLAIMS AS TO BLECKMAN'S "PROTECTED WORKS" - COPYRIGHT INFRINGEMENT

46.     Bleckman and her attorney Kernan are asserting that a video clip of evidence at the SCPD Property Division of the physical evidence from the DeFeo case as used in the Shattered trilogy and the Reelz special are a "protected work" of Bleckmans and that Plaintiff's have infringed her copyright for which she is seeking $1.5M in her demand letter to Plaintiffs.   Plaintiff's now seek adjudication from the Court that this scenario is without merit and wanting in fact for the reasons asserted herein.

### A. BLECKMANS CLAIMS AS TO COPYRIGHT INFRINGEMENT ARE BARRED BY STATUTE OF LIMITATIONS WITH REGARDS TO THE *SHATTERED* TRILOGY

47.     Defendant Bleckman's Complaint, as tendered to Plaintiffs by attorney Kernan focuses on the Reelz special, specifically, as violating Bleckman's copyright through the use of a clip of an evidence reel shot at the SCPD Property Division.  While Plaintiff's will attack the veracity of these allegations herein, the Plaintiffs seek a determination from the Court as to whether the original *Shattered* trilogy can be subject of a copyright infringement action.

48.     17 U.S.C. §507(b) specifically holds that "No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."   Bleckman's complaint, with regards to the Shattered series must be barred because it is barred by 17 U.S.C.'s statutory limitations.

49.     The Plaintiff's released *Shattered Hopes - Part I:  From Horror To Homicide* on December 16, 2011.  The film was released on Amazon OnDemand, as well as DVD via the production's website and on Amazon as a DVD at approximately this time.  During this period, Bleckman was actively working with the Plaintiffs and in full knowledge of the release and was given copies of the DVD.  Bleckman would have, reasonably, had until December 16, 2014 to file a claim for any alleged violations.  Bleckman failed to do so.  Therefore, Plaintiffs request Court make a finding that *Shattered Hopes, Part I*, cannot be the subject of any future action before this or any other Court because such claim for infringement would be barred by 17 U.S.C. §507(b).

---

COMPLAINT FOR DECLARATORY RELIEF
KATZENBACH V. BLECKMAN
COMPLAINT                                                                                    15

50.    The Plaintiff's released *Shattered Hopes - Part II: Mob. Mayhem. Murder.* on October 26, 2012.   Clips from the SCPD evidence video appeared at 1:01:49, 1:27:04, 1:41:09, and at various other points in the DVD. Bleckman was still dealing with Plaintiff's at this point and was most definitely aware of the release of the second DVD since it was available on Amazon OnDemand, Amazon as a DVD for a brief period, and through the project's website. Bleckman would have reasonably had until October 26, 2015 to file a claim for infringement against the Plaintiff's. She did not do so. Plaintiff's request that the Court make a finding that *Shattered Hopes Part, Part II*, cannot be the subject of any future action before this or any other Court because such claim for infringement would be barred by 17 U.S.C. §507(b) since she did not timely bring a complaint for infringement.

51.    The Plaintiffs released *Shattered Hopes - Part 3.1*, entitled *Fraud & Forensics*, which is exactly half of the final third installment on or around July 24, 2013.   (Plaintiff's released the *Fraud* half of the story only.) The installment also utilizes clips from SCPD's Property shoot. Bleckman would have had until July 24, 2016 to file a claim for copyright infringement. She did not do so. Plaintiff's request the Court to declare that *Shattered Hopes Part, Part 3.1*, cannot be the subject of any future action before this or any other Court because such claim for infringement would be barred by 17 U.S.C. §507(b) since she did not timely bring a complaint for infringement.

## B. PLAINTIFF'S *75-A-4053: INTERVIEWING AMITYVILLE MURDERER RONALD DEFEO, JR.* PROJECT DOES NOT INFRINGE ANY COPYRIGHT OF BLECKMANS

52.    Bleckman, via her demand letter from her attorney and in the Complaint tendered to Plaintiff's has threatened to encumber Plaintiff's supplemental DVD, the interview with Ronald DeFeo, with litigation saying that it has utilized her protected work. But, in reviewing the interview, there has been no use of the SCPD Property evidence footage anywhere in the interview.  Therefore, absent any such use, Bleckman cannot allege a copyright violation.  Absent any proof of this from Bleckman, Plaintiff's request the Court to adjudicate that *75-A-4053* cannot be subjected to any future copyright infringement litigation claim by Bleckman.

53.    Bleckman, though not specific, seems to believe that *75-A-4053*, by virtue

of being a project developed as a result of the *Shattered* trilogy "misappropriated Ms. Bleck-man's ideas and proprietary research..." (Exhibit "N," Michael Kernan letter, P1, ¶3). However, this is not the case. As demonstrated before the Court with the various emails and exhibits, Bleckman essentially departed the project in October 2012. The Plaintiffs did not hear a word from her again until October 2014. The DeFeo interview occurred approximately twenty-two months after Bleckman's departure in June 2014. The interview was the result of correspon-dence between Plaintiff Katzenbach and DeFeo who is incarcerated at Green Haven Correctional Facility. The interview is of a very general nature, recounting his life, his memories of his fam-ily, and ultimately his crime. Bleckman was not involved in securing the interview with DeFeo. Bleckman did not participate in the interview. Bleckman had absolutely NOTHING to do with this endeavor. Plaintiff requests that the Court find that *75-A-4053* does not, in any way, infringe upon any "idea or proprietary research" of Bleckmans and is thus there has been no infringement of her copyright or a protected property.

## C. BLECKMAN DOES NOT HOLD A FEDERALLY PERFECTED COPYRIGHT ON THE SUFFOLK COUNTY PROPERTY ROOM EVIDENCE REEL

54. Gail Bleckman holds Federally perfected U.S. copyrights. (Exhibit "O") A check of the U.S. Copyright Office database shows that Bleckman holds seven copyrights on her various projects, her first being filed in 2008. In fact, excepting but a few years, she's almost filed for a copyright every year since 2008. All of these copyrights are on film projects or "proprietary" concepts or ideas that she has for projects yet to come to fruition. For instance, she holds a copyright on *Cancer, And My Name Is_____*, which was the series she supposedly sold to Ion Channel when she met Plaintiff Maiocco. Another project, *Slapsie Maxie* is a project about that famous historical figure which, also, is but a concept that Bleckman was working on at the same time she was working with Plaintiffs on Amityville. Obviously, Defendant Bleckman is mindful of the protections that copyrights provide and has taken the time and expense to pro-tect her intellectual properties. However, in the case of Amityville, Bleckman is now asserting that she holds a copyright on the Suffolk Police Evidence reel. But, clearly, she does not hold a perfected copyright. Considering that the reel was shot in March 2011, she has had nearly six

1  years to perfect this copyright. Plaintiffs assert that the reason she never registered the copyright

2  is because she knew, full well, that it was not her intellectual property to copyright.

3      55.     Plaintiff's ask the Court to adjudicate that Defendant Bleckman is not

4  entitled to statutory damages or attorney fees in accordance with 17 U.S.C. §412 that provides

5  such statutory relief only to those aggrieved copyright holders who do possess a perfected U.S.

6  Copyright registration.

7  **D.  BLECKMAN CANNOT BE THE COPYRIGHT OWNER/CLAIMANT BECAUSE**

8  **SHE DID NOT PRODUCE THE ACTUAL WORK THAT COULD BE COPYRIGHTED**

9      56.     Bleckmain claims in her Complaint, (P6, ¶23, L23-25) that: "Bleckman

10  created video footage depicting her explaining the significance of a blood pattern on a piece of

11  clothing and describing spent gun shell casings." Plaintiffs assert that Bleckman is not capable

12  of being the owner or "creator" of the Suffolk County Property Division footage reel. It is not

13  Bleckman's intellectual property because she did not physically shoot the footage. Asserts Plain-

14  tiffs, in order for a work to be protected by copyright, it must be "fixed." This means that the

15  work must be put down in some tangible medium of expression. In this case, that tangible me-

16  dium of expression is a videotape which Bleckman personally delivered to the Plaintiff in March

17  2011 when she returned from New York to California.

18      57.     As already discussed, and conceded in Bleckman's potential lawsuit at

19  Exhibit "N," it is not contested that Plaintiffs brought Bleckman on as a producer on the project

20  working for a five-percent royalty. However, Bleckman has not alleged, and was factually not

21  hired, to ever be a "camera operator" or "director" or "director of photography." Furthermore,

22  she has not alleged she ever did these things. Bleckman, additionally, has not alleged that she

23  had the equipment in her possession to shoot the quality and style of film required for the proj-

24  ect. Plaintiffs required, to be compatible with their native footage, that any footage intended for

25  inclusion in the project had to be shoot in a 24p frame rate in an anamorphic or squeeze mode to

26  achieve a 16:9 aspect ratio. Absent this expensive equipment, Bleckman was unable to shoot the

27  reel in the property room.

28      58.     Bleckman's inability to shoot the footage necessitated the hiring of a vid-

1    eographer for the Suffolk Property shoot. And, on or about March 4, 2011, this is exactly what

2    the Plaintiffs did. Bleckman suggested a videographer; Plaintiff's agreed. Because of a very

3    short notice for the shoot, there was no time to send a check to Bleckman or the videographer

4    and the videographer (believed to be John Collins whom was used on multiple shoots) wanted to

5    be paid for the session on the same day he shot it. As a result of this, Plaintiff Maiocco, on the

6    instruction of Plaintiff Katzenbach, in a rapid succession of phone calls, told Maiocco to transfer

7    $200.00 from her Bank Of America account to Bleckman's Bank of America account. This was

8    done on approximately March 4, 2011, and evidence of the transfer is included in Exhibit "E"

9    which contains a bank statement showing the transfer. It was understood by all that Bleckman

10   was to withdraw that $200.00 or write a check for said funds to pay the videographer. As ref-

11   erenced at Exhibit "D," this transferance of funds to Bleckman's account was a frequently used

12   practice by Plaintiff's when they needed to get funds to Bleckman for the project. She references

13   this fact in an email at Exhibit "D." It is reasonably assumed that the videographer was paid

14   since the videographer turned over the tape to Bleckman who, in turn, turned it over to Katzen-

15   bach.

16           59.    Plaintiffs assert to the Court that, given the facts and evidence present,

17   it's clear that (a) Bleckman did not own the camera equipment necessary to make the tape at the

18   subject of controversy; (b) Bleckman was not hired to be a camera operator; (c) that the Plaintiffs

19   hired a videographer on a "work for hire" basis for a brief shoot at the SCPD. Therefore, if there

20   can be any claim for a copyright infringement, such claim would have to come from the party

21   who actually created the tangible medium that can be subject to copyright protection. Clearly,

22   if it were not for the hiring of the videographer by Plaintiffs, and their compensation of him,

23   Bleckman's extemporaneous or improvised speech on the tape, wherein she explains what we're

24   seeing, would have been just that and there's no copyright protection for such.

25           60.    Plaintiff directs the Court to Exhibit "P" which is a DVD that contains

26   a roughly 4-minute clip of Defendant Bleckman which was recorded in approximately March

27   2011. This clip is from a tape that Plaintiffs believe was long ago recorded over, but a few snip-

28   pets exist in digital format. The clip was generated with the intention of being a DVD "Bonus

COMPLAINT FOR DECLARATORY RELIEF
KATZENBACH V. BLECKMAN
COMPLAINT                                                                                    19

1  Feature" wherein Bleckman told her account of tracking down documents and such while work-

2  ing on the project. After Bleckman saw the tape, she objected to her appearance and requested it

3  be destroyed. Today on a few pieces of the tape exist in a digital format. Within this clip, Bleck-

4  man recounts the shoot at SCPD and Ryan Katzenbach can be heard, in asking to explain the pro-

5  cess, discussing what he instructed Bleckman to do leading up to the shoot. Katzenbach explains,

6  in refreshing Bleckman's memory, that he had told her to ask for many, many pieces of evidence

7  from Suffolk County when, in fact, he was only wanting to film one:  Dawn DeFeo's nightgown.

8  Gail then, on her own, explains how she set about doing this. This clip is relevant and important

9  because Bleckman has maintained, throughout her tentative lawsuit, that this work is protected

10  because its solely her ideas and proprietary research. However, in the case of the Property Divi-

11  sion shoot, it's clear that this is not the case; Plaintiff Katzenbach was calling the shots as to what

12  was being done, as he did at all times throughout this process because Bleckman was not as well

13  versed in the subject matter as Katzenbach.

14       61.    Plaintiff's respectfully ask the Court for a determination that Plaintiff's are

15  the rightful owners of the work for hire SCPD Property tape and that Bleckman cannot lay claim

16  to ownership or copyright and thus cannot sue for copyright infringement.

17  **E. BLECKMANS "PROPRIETARY RESEARCH" DID NOT LEAD TO THE**
18     **DISCOVERY OF THE "SECOND" DEFEO MURDER WEAPON**

19       62.    Bleckman's tentative Complaint states that (P6, ¶22, L15-22) that

20    Bleckman's proprietary research uncovered evidence that more than
21    one weapon had been used to commit the murders, and that the second
     weapon had likely been discarded in a canal near the house where the
22    murders were committed. This theory would be a central storyline in
     the Films and the REELZ Special...
23

24    Bleckman's allegations are entirely incorrect. Bleckman was a producer who joined the

25  project in the summer of 2010, a fact which is undisputed. Prior to this, Plaintiff Katzenbach

26  had nearly 10 years of experience and investigatory work into this case and understood the facts

27  forwards and backwards. Convicted mass-murderer Ronald DeFeo has claimed for four decades

28  that another gun was involved -- and specifically -- a .38 handgun. These allegations and asser-

1  tions were the very subject of Ric Osuna's 2001 book *The Night The DeFeos Died*, which con-

2  cluded that the second caliber of bullet found in murder victim Louise DeFeo differed from the

3  bullets found in the other victim.  In 2001, when Osuna and Katzenbach joined forces, they both

4  discussed the random photos shot at Coles Avenue and how these photos fit into the DeFeo crime

5  scene.  A detective who appears in Plaintiffs films in 2009 actually admits that the police knew

6  there was a second gun but says, in the film, "we never did find it."  Bleckman lacked a thorough

7  understanding of the case and all of its intricacies to reach a conclusion that "the second weapon

8  had likely been used" or that it was "discarded in a canal near the house where the murders were

9  committed" without the analysis of Katzenbach.   It wasn't until after Bleckman had delivered

10  a copy of the SCPD file that Katzenbach, upon analysis, came up with the theory that the "sec-

11  ond gun" was in the canal at the Coles Avenue bulkhead, which he then shared with Bleckman.

12  Bleckman would have never arrived at this theory on her own because she did not have enough

13  insight into the case; thus, as a result of this, this theory is not her "proprietary research" which

14  she wishes the Court to believe as of this filing.  Katzenbach and Maiocco will present, at trial,

15  witnesses who can attest to the fact that this is entirely Katzenbach's finding and conclusion and

16  not Bleckman's.

17      63.    Plaintiffs ask the Court for a determination that Bleckman's "proprietary

18  research" was not strong enough, in and of itself, to constitute the Plaintiff's film; that while her

19  research and fruits did contribute to the overall piece, it was very much a collaborative effort with

20  Katzenbach in the lead, and with him providing Bleckman with the basis for every one of the av-

21  enues she researched.

22  
23
<center>**SECOND CLAIM FOR RELIEF**
**CLAIMS AS TO THE "ORAL AGREEMENT" BREACH OF CONTRACT, et. al.,**</center>

24      64.    Much of the Defendant's tentative Causes of Action center on the contrac-

25  tual dispute present between the parties.  Plaintiffs seek the determination of the Court as to what

26  rights, responsibilities and obligations are owed by the parties to each other with regards to claims

27  based on the oral agreement and Bleckman's breach of contract.

28  ///

---

## A. BLECKMAN'S CLAIMS AS TO THE SCREEN ACTORS GUILD

65.    Plaintiff's do not disagree with the assertions made as to the Oral Agreement, P4-5, ¶15, L27-28, L1-7, in the Defendant's tentative lawsuit at Exhibit "N." However, Bleckman's further allegations must be disposed of by this Court (P5, ¶16 - 18, L8-19). Plaintiff's status as a Screen Actors Guild Signatory Production Company is entirely irrelevant to this action. At no time has Bleckman alleged how this has any bearing on her present case. The production entered into SAG signatory status at its very end for the purpose of hiring Edward Asner as the project's narrator. Bleckman is not an actor, has not alleged that she acted in the film; she is not signatory to the Guild and is therefore not entitled to any union-related damages or compensation. Plaintiff's ask for a determination of such from the Court.

## B. BLECKMAN HAS ALREADY BREACHED THE 2010 ORAL AGREEMENT BETWEEN PLAINTIFFS AND HERSELF

66.    Plaintiff's ask the Court for a determination as to whether a valid and enforceable contract presently exists between the Plaintiff and Defendant.

67.    Based on the exhibits provided, it's evident that an oral agreement was made in the summer of 2010 procuring the services of the Defendant in this action. Defendant was to work as a producer and researcher on the Plaintiff's film in return for a five-percent royalty of monies received, after the first $50,000.00 had been recovered by the Plaintiffs and also, it was made clear by Plaintiff's to Defendant, royalty was figured after other certain industry-standard and permissable offsets were deducted (i.e., advertising and commission expenses, returns, etc.,.).

68.    It was agreed upon by the Plaintiffs and Defendant that, at some unspecified point, the parties would memorialize their oral agreement into a formal written contract. Plaintiffs, in October 2012 delivered to Defendant an agreement. The agreement is provided as Exhibit "Q." This agreement was based on a standard boilerplate agreement used with everyone who participated in the film and was to receive some sort of down-stream royalties compensation. This contract had been in use by the Plaintiff's since filming commenced in 2006. While the terms varied for actors or consultants, musicians, etc., the computations in the Riders or

1  Exhibits remained principally the same for all.

2       69.     Defendant's relationship with the Plaintiffs had deteriorated badly by the

3  time the contract was delivered to her in October 2012 due to the capricious and vindictive ac-

4  tions she was taking against the Plaintiffs.  Defendant had been, for starters, virtually from the

5  start of the project, defaming the Plaintiffs to everyone -- which had been getting back to the

6  Plaintiffs.  In 2012 she began threatening Plaintiffs that she considered certain materials, paid for

7  by the Plaintiffs, as her own and as such planned to pursue other avenues for production or dis-

8  tribution.  Her actions violated the expected right of the Plaintiff's to keep business matters and

9  proprietary information private and confidential.  The conflicts between Plaintiff Katzenbach

10  and Defendant are included as Exhibit "R."

11       70.     After Plaintiff tendered a draft of the contract to Defendant on October

12  17, 2012, Defendant, who had been a huff to get the contract DID NOTHING.  On October 23,

13  2012, Plaintiff sent Bleckman an email, Exhibit "S," asking "Haven't heard back from you since

14  delivering the contract.  What are we doing and where are we at? -R."  The Defendant replied

15  on October 24th: "I need to set aside some time for review, as other more pressing things have

16  taken priority.  Will get to it soon."

17       71.     "Soon," to the Defendant, is apparently over two full years.  The next

18  time the Defendant would surface would be October 29, 2014 wherein she wants to know 'where

19  we're at.'  Katzenbach tells her to execute the contract and return it if she wants to be paid, as can

20  be seen in Exhibit "T."  To date, on the eve of two years since that exchange, the Defendant has

21  still not returned a signed contract and, in the meantime, has demanded a complete renegotia-

22  tion of the terms, which would effectively change her pay structure, while also demanding full

23  audits (which no one has ever asked the Plaintiffs for), and removing all confidentiality riders

24  because Defendant knows she's violated those repeatedly.  Plaintiffs believe that the reasonable

25  time to renegotiate has come and gone; that Defendant should not have taken four years to seek

26  modification.  Plaintiffs assert that Defendant, who has acknowledged that one of the specific

27  terms of the 2010 Oral Agreement was to reduce said agreement to a contract has breached the

28  oral agreement by waiting more than three years before bringing such oppressive revisions to

**COMPLAINT FOR DECLARATORY RELIEF**
**KATZENBACH V. BLECKMAN**
**COMPLAINT**                                                               23

1    the table.  Furthermore, Plaintiff's failure to pay the Defendant has been the result of her own

2    doing through her inaction and stonewalling in an attempt to extort the Plaintiffs.  In addition

3    to refusing to execute the contract, Defendant has refused to provide a current address, or any

4    of the required tax documents necessary to pay her.  Because the Defendants compensation

5    would amount to more than $600.00 U.S.D., which requires the issuance of a 1099 statement at

6    the end of the year, and any subsequent year that follows, Plaintiff needs a valid address, a W9

7    (or whatever tax instrument is required depending upon how Bleckman wishes to be paid.)  to

8    be on file for such payment to be issued.  Plaintiff's are asking the Court for a determination of

9    whether Plaintiffs are even obligated to renegotiate or if the oral agreement is now nullified by

10   Defendants repeated and ongoing breach of the original agreement.

11   **C.  DEFENDANT'S CLAIMS TO BREACH ARE BARRED BY STATUTE**
        **OF LIMITATIONS - CAL. CODE. OF CIV. PROC. §339**
12

13           72.     Defendant's claims of breach of contract, and breach of implied-in-fact of

14   contract are barred by the statute of limitations due to Bleckman's failure to bring a timely claim.

15           73.     Within Exhibit "R," Defendant clearly stated in her October 16, 2012

16   email that (a) the Plaintiffs have failed to deliver a contract; that (b) she has not been compen-

17   sated; and that (c) she construes the actions of the Plaintiffs to be "completely illegal AND un-

18   acceptable."  She concludes the email by saying "...I am not sitting for an interview and I will

19   be exercising my legal options from here on in."  This effectively, asserts Plaintiffs, began her

20   statute of limitations for any breach of contract claim to that point.

21           74.     California Code of Civil Procedure §339 dictates that an action may be

22   brought within two years for "An action upon a contract, obligation or liability not founded upon

23   an instrument of writing..."  Therefore, Bleckman had until October 16, 2014 to bring a claim for

24   breach; she did not.  In fact, Bleckman did not even surface again until October 29, 2014.  She's

25   taken, literally, a year between the times she's surfaced since up to the present.

26           75.     Plaintiffs ask the Court for the determination that any claims for breach of

27   contract between 2010 and the date of this action be barred since Defendant has failed to timely

28   file such claim; and alternatively for a finding as to whether there is even a valid Oral Agreement

**COMPLAINT FOR DECLARATORY RELIEF**
**KATZENBACH V. BLECKMAN**
**COMPLAINT**                                                                                    24

1   in place as of today upon which further claims could be made.

2   <div align="center">**V. CONCLUSION**</div>

3         76.     Plaintiff's have spent a considerable amount of time and resources in

4   making their documentary projects on Amityville. Bleckman's threats to Plaintiffs to file suit

5   and pursue claims of copyright infringement and violation of other purported rights have cre-

6   ated an actual, substantial and judiciable controversy between the Plaintiffs and the Defendant

7   concerning the rights of Plaintiffs to continue to develop, produce, distribute and exhibit its

8   documentary works.

9         77.     A judicial determination of the parties' rights and obligations is necessary

10   in order to avoid irreparable harm to Plaintiffs. Plaintiff's have no adequate remedy at law.

11   <div align="center">**PRAYER**</div>

12         **WHEREFORE**, plaintiff's Katzenbach and Maiocco demands that this Court

13   enter a judgment:

14         (1) Determining that Plaintiffs films, *Shattered Hopes* Parts 1 through 3.1 are not

15   subject to any copyright claim asserted by Bleckman because the statute of limitations bars any

16   such infringement action; and

17         (2) Determining that Plaintiffs *75-A-4053* film, the interview of Ronald DeFeo,

18   Jr., does not infringe any copyright or protected property of Bleckmans; and

19         (3) Determining that Defendant Bleckman does not possess a Federally perfected

20   copyright on the SCPD Property footage; and

21         (4) Determining that Defendant is not the copyright owner of the SCPD Property

22   footage because she did not produce a work that could be copyrighted; and

23         (5) Determining that Defendant's "proprietary research" did not lead to the dis-

24   covery of the "second" murder weapon or the DeFeo interview; and

25         (6) Determining that, overall, Plaintiffs did not violate any intellectual property

26   rights or copyrights of the Defendant; and

27         (7) Determining that Defendant is not entitled to any type of compensation or

28   damage as a result of association with SAG-AFTRA; and

1    (8) Determining that Defendant has breached the 2010 Oral Agreement; and

2    (9) Determining that Defendants claims for breach of contract are barred by Cal.

3    Code of Civ. Proc. §339; and

4    (10) Determining what rights, duties or obligations are owed by Plaintiffs to De-

5    fendant under the 2010 Oral Agreement, if any; and

6    (10) Determining that if Plaintiffs have not engaged in any of the actions com-

7    plained up, Defendant cannot seek damages from other third party distributors including Hub-

8    bard Broadcasting, Reelz Channel and Amazon; and

9    (11) Award of the costs of this action to the Plaintiff's, together with reasonable

10   attorneys fees should they eventuate; and

11   (12) Granting such other and further relief, whether legal or equitable, to which

12   the Court feels Plaintiffs are entitled.

13   **DATED:** 27 October 2016

14

15   BY: _____

16   RYAN KATZENBACH

17   PLAINTIFF IN PRORIA PERSONA

18   BY: _____

19   DIANA MAIOCCO

20   PLAINTIFF IN PROPRIA PERSONA

21

22

23

24

25

26

27

28

**COMPLAINT FOR DECLARATORY RELIEF**
**KATZENBACH V. BLECKMAN**
**COMPLAINT**                                                          26

**VERIFICATION**

I, Ryan Katzenbach, declare that:

I am the Plaintiff in the matter of <u>Katzenbach, Maiocco v. Gail Bleckman.</u> I have prepared and read the foregoing Plaintiff's COMPLAINT FOR DECLARATORY RELIEF and know the contents thereof. The same is try of my own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED ON  27 OCTOBER 2016 at LOS ANGELES, CALIFORNIA.


RYAN KATZENBACH


**VERIFICATION**

I, Diana Maiocco, declare that:

I am the Plaintiff in the matter of <u>Katzenbach, Maiocco v. Gail Bleckman.</u> I have prepared and read the foregoing Plaintiff's COMPLAINT FOR DECLARATORY RELIEF and know the contents thereof. The same is try of my own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED ON  27 OCTOBER 2016 at LOS ANGELES, CALIFORNIA.


DIANA MAIOCCO

# EXHIBIT "A"
Complaint For Declaratory Relief
Katzenbach v. Bleckman

Print

10/28/16, 4:52 AM

**Subject:**   Re: Videographer . Bob Blankemeier

**From:**   Bob Blankemeier (bobblankemeier@gmail.com)

**To:**   katadvertising@yahoo.com;

**Date:**   Sunday, April 11, 2010 5:42 PM


Hey Ryan,


That sounds fine to me. There really shouldn't be any problems at all. If you need any dolly shots for the grave site, I have a dolly and track too. The hmc-150 shoots only to SD cards. The footage is very easily matched with the dvx-100 though, I have matched it before. With the tape thing; Previous clients and I have just exchanged an inexpensive external hard drive. I keep the files back-ed up on my drives until the footage is safely in your hands. You are out in California right? It should take around 5 business days to ship it out there ups ground.

Cost wise is not much different than tapes, hard drives are very cheap these days. Brooklyn and Chester is fine, I would just need to be covered for the expenses to get there. Also, what rate were you thinking for operation and gear?


Thanks,


Bob Blankemeier
203-247-1969


On Sun, Apr 11, 2010 at 8:15 PM, Ryan Katzenbach <katadvertising@yahoo.com> wrote:
   Hi Bob,

   We're currently shooting a documentary, and there's a few more pieces I need --- simple stuff, but it's a huge time consuming pain to fly to NY and do it since our subject matter is on the east coast.

   The first thing I need are some shots of a couple of graves --- I think they're in Brooklyn, but I am not sure and I am doing some research right now to find them. Nothing earth shattering there. What would you charge to travel out a cemetery in Brooklyn and capture those gravestones? I'd want 10 seconds of the headstones still; then a series of quick dutch angles, pans, stuff like that to give me some choices.....close-ups on the names, dates, etc.,.

   The next thing --- I have an interview I need to do. The subject is north of NY in Chester; I'd maybe like to figure out what you'd need to run up there and do an interview with her. I can supply all the info as to how I want it framed, etc.,. and then I would conduct the interview via speakerphone with the gal while you

Print

10/28/16, 4:52 AM

taped the interview.

The interview wouldn't be until around June ---- the shots of the grave would be as soon as I complete research in the next few weeks and determine exactly where they are at.

Give me your thoughts and ideas of cost.....and is the HMC150 solely a PS2 card or does it shoot tape? I know the HVX has both...want to make sure whatever we do is compatible with the footage we've already got. We're at the very tail end of this film now, so no sense changing horses in the middle of the stream!

Best,
Ryan K.

--- On **Sun, 4/11/10, Bob Blankemeier <*bobblankemeier@gmail.com*>** wrote:

> From: Bob Blankemeier <bobblankemeier@gmail.com>
> Subject: Videographer . Bob Blankemeier
> To: gigs-7mtf3-1687493455@craigslist.org
> Date: Sunday, April 11, 2010, 5:04 PM
>
> ** CRAIGSLIST ADVISORY --- AVOID SCAMS BY DEALING LOCALLY
> ** Avoid: wiring money, cross-border deals, work-at-home
> ** Beware: cashier checks, money orders, escrow, shipping
> ** More Info: http://www.craigslist.org/about/scams.html
>
> Hey how are you?
>
> My name is Bob Blankemeier and I am a videographer working in NYC and the greater area. I own a Panasonic HMC-150 (new HD dvx-100), wireless sound kit w/ lav and cartoid mics, and a few lights. I currently work for a company that shoots videos similar to what you are describing. It is a lot of run and gun. I am currently available and would like to pick up more work. Feel free to call me and discuss the projects further on my cell, 203-247-1969. My resume is on my personal website below
>
> Thanks,
>
> Bob Blankemeier
> 203-247-1969
> www.BobBlankemeier.com
> http://www.imdb.com/name/nm2975465/

**Subject:**   Re: Freelance writer/investigative journalist

**From:**   Ryan Katzenbach (katadvertising@yahoo.com)

**To:**   rosencrance1@yahoo.com;

**Date:**   Monday, April 12, 2010 12:29 AM

Hi Linda,

Thanks for the submission!  I'll get back to you in a day or so as I have been literally overwhelmed with replies!  I had no idea that there would be this interest.

My biggest concern is that you are in Massachusetts.  I am going to need someone on the ground in Long Island for the story I have in mind.  Your thoughts?

Best,
Ryan Katzenbach

--- On **Sun, 4/11/10, Linda Rosencrance <*rosencrance1@yahoo.com*>** wrote:

> From: Linda Rosencrance <rosencrance1@yahoo.com>
> Subject: Freelance writer/investigative journalist
> To: gigs-rrfst-1687498039@craigslist.org
> Date: Sunday, April 11, 2010, 8:10 PM
>
> Hi, I am responding to your ad on Craigslist for a freelance writer/investigative journalist. I am
> currently a freelance writer/editor in Massachusetts. I was a reporter at Computerworld, an
> information technology magazine in Framingham, Mass. for nine years. I have a BA in English from
> the University of Massachusetts and I've been a journalist since the late 1980s. I've written for and
> done proofreading and copyediting/editing for a group of community newspapers in the Boston area,
> where I covered politics and was a high-profile investigative reporter. And I've freelanced for
> the Boston Globe and the Boston Herald. I am the published author of four true crime books "Murder
> at Morses Pond," "An Act of Murder," "Ripper" and "Bone Crusher" for Kensington Publishing
> Corp. (Pinnacle imprint). I've edited a variety of manuscripts including fiction, memoirs and
> biographies and I've written investigative stories, press releases, white papers, FAQs, case studies,
> Web site copy, health-related articles, "green" articles for an eco-friendly website devoted to luxury
> goods, and real estate/home improvement articles. I've also done editing and proofreading for a
> group of high-end magazines in New Jersey. I've written for a high school textbook publisher and
> I've ghostwritten business/technology e-books, self-help books, novels and several
> memoirs/biographies. Although I'm based in Boston I work with clients across the country. I have
> enclosed my resume detailing some of the investigations I've done.
>
> Thanks,

Linda Rosencrance

h-781-894-0928

c-339-927-6632



Ryan, search your mailbox

Home

Compose

Search results Archive Move Delete More

Inbox (487)
Drafts (343)
Sent
Archive
Spam (303)
Trash (14)
Smart Views
Folders (239)
Recent

Re: Freelance writer/investigative journalist

People

**Ryan Katzenbach** <katadvertising@yahoo.com> 04/12/10 at 12:29 AM
To Linda Rosencrance

Hi Linda,

Thanks for the submission! I'll get back to you in a day or so as I have been literally overwhelmed with replies! I had no idea that there would be this interest.

My biggest concern is that you are in Massachusetts. I am going to need someone on the ground in Long Island for the story I have in mind. Your thoughts?

Best,
Ryan Katzenbach

--- On **Sun, 4/11/10, Linda Rosencrance *<rosencrance1@yahoo.com>*** wrote:

> From: Linda Rosencrance <rosencrance1@yahoo.com>
> Subject: Freelance writer/investigative journalist
> To: gigs-rrfst-1687498039@craigslist.org
> Date: Sunday, April 11, 2010, 8:10 PM
>
> Hi, I am responding to your ad on Craigslist for a freelance writer/investigative journalist. I am currently a freelance writer/editor in Massachusetts. I was a reporter at Computerworld, an information technology magazine in Framingham, Mass. for nine years. I have a BA in English from the University of Massachusetts and I've been a journalist since the late 1980s. I've written for and done proofreading and copyediting/editing for a group of community newspapers in the Boston area, where I covered politics and was a high-profile investigative reporter. And I've freelanced for the Boston Globe and the Boston Herald. I am the published author of four true crime books "Murder at Morses Pond," "An Act of Murder," "Ripper" and "Bone Crusher" for Kensington Publishing Corp. (Pinnacle imprint). I've edited a variety of manuscripts including fiction, memoirs and biographies and I've written investigative stories, press releases, white papers, FAQs, case studies, Web site copy, health-related articles, "green" articles for an eco-friendly website devoted to luxury goods, and real estate/home improvement articles. I've also done editing and proofreading for a group of high-end magazines in New Jersey. I've written for a high school textbook publisher and I've ghostwritten business/technology e-books, self-help books, novels and several memoirs/biographies. Although I'm based in Boston I work with clients across the country. I have enclosed my resume detailing some of the investigations I've done.
>
> Thanks,
> Linda Rosencrance
> h-781-894-0928
> c-339-927-6632

**Subject:** Re: Freelance Writer/Investigative Journalist Needed (Long Island)

**From:** Ryan Katzenbach (katadvertising@yahoo.com)

**To:** customerservice@perfectedpen.com;

**Date:** Monday, April 12, 2010 12:40 AM

Hi there Sabrina,

Thanks for the submission.  I reviewed your website, I am interested in speaking further.

I would like to have written, for publication on our website, a story about a murder than happened on Long Island about 36 years ago.  It's an obscure case; it will require a visit to the Suffolk County Police Department to review crime scene photos, which means you will have to arrange the meeting to review the photos.

Please indicate to me whether this would be something you would be interested in possibly doing and, if so, what your rate is.  Do you charge by word/by hour, etc.

Thanks,
Ryan Katzenbach

--- On **Sun, 4/11/10, Sabrina Carpenter <*customerservice@perfectedpen.com*>** wrote:

> From: Sabrina Carpenter <customerservice@perfectedpen.com>
> Subject: Freelance Writer/Investigative Journalist Needed (Long Island)
> To: gigs-rrfst-1687498039@craigslist.org
> Date: Sunday, April 11, 2010, 5:58 PM
>
> ** CRAIGSLIST ADVISORY --- AVOID SCAMS BY DEALING LOCALLY
> ** Avoid: wiring money, cross-border deals, work-at-home
> ** Beware: cashier checks, money orders, escrow, shipping
> ** More Info: http://www.craigslist.org/about/scams.html
>
>
> I am the owner of Perfected Pen Freelance Writing. (www.PerfectedPen.com)  I specialize in copy, ghostwriting, website content and editing. I am professional, experienced and have an impeccable work ethic with quick turnaround times. I work remotely for clients throughout the US, as well as some overseas. My clients love the ease and convenience of my services.
> I look forward to hearing from you and learning more about your writing needs and budget!
> Sabrina Carpenter
>
> http://newyork.craigslist.org/lgi/wrg/1687498039.html

Print

10/28/16, 4:49 AM

this message was remailed to you via: gigs-rrfst-1687498039@craigslist.org

# EXHIBIT "B"

Complaint For Declaratory Relief
Katzenbach v. Bleckman

# EXHIBIT "C"

Complaint For Declaratory Relief
Katzenbach v. Bleckman

Print

10/28/16, 4:46 AM

**Subject:** Re: FW: Suffolk County Central Records FOIL Request : Records Are Not Possess...

**From:** GBleckman@aol.com (GBleckman@aol.com)

**To:** katadvertising@yahoo.com;

**Date:** Wednesday, August 18, 2010 5:47 PM

Yep... I totally agree.with you. What gets me now after reading this is that the first exchange was a bit informal, and this response is a bit too guarded. Jim's got an in at central records and told me that his contact's name is Janine.. I'm going tomorrow to file another foil for the investigative report... just under the premise that this case fascinates me after some minor leg work on the some details.

So, I asked Jim what would be in the report, and he named a bunch of shit... nothing that you didn't mention. I then asked him under what premise would they deny any of the records, and he said that if it would endanger anything ongoing, or fuck up an appeal, they wouldn't/couldn't release info. He told me that Janine would put my foils on top of the heap of thousands, so that's great!  Tomorrow when I file the latest foil, I'll give Jim the copy and he'll get it to Janine as well... shit's moving along :)
G.

*Warm Regards,*
*Gail Bleckman*
*Producing Partner,*
*Amdram Productions, Inc.*
*Cell: 631 . 334 . 1860*
*GBleckman@aol.com / AmdramProduction@aol.com*

*In a message dated 8/17/2010 10:41:58 P.M. Eastern Daylight Time, katadvertising@yahoo.com writes:*

**Note that they denied this request the next afternoon....seems too sudden for me.**

**----Forwarded Message----**
**From: katadvertising@yahoo.com**
**To: katadvertising@yahoo.com**
**Sent: Fri Sep 18th, 2009 11:38 AM PDT**
**Subject: Suffolk County Central Records FOIL Request : Records Are Not Possessed By This Agency**

**In accordance with your recent Freedom of Information (FOIL) application, please be advised that this shall serve as official notification that the records requested cannot be found after a diligent search, are not possessed by this agency or do not fall within the Suffolk County Police Department's jurisdiction.**

**Subject:**   Fwd: I didn't want to send this through Facebook...

**From:**   Dianamaiocco@aol.com (Dianamaiocco@aol.com)

**To:**   katadvertising@yahoo.com;

**Date:**   Tuesday, November 9, 2010 7:53 PM


---- Forwarded Message -----

How do you feel about this?
Hey Ryan...
Who needs the threat of the government intercepting FB threads... so I'm writing to you via reg. email..

From what I've been told, they don't have anything at the D.A's office... but I'll call again just to double check. The D.A.'s office told me that all their crap was archived in MS... you may be referring to the county clerk's office, that's where I was the other day.

This is what I'm thinking...Okay. So what I mentioned to you the other day was to just keep my name in here because who knows what notes they may (or may not) have on you- and may not disclose a thing to you. Why risk it... they've got nothing on me but niceties, and they know that I'm doing a story based on the facts because of all the recent press that's been done on Amityville (human interest).. and of course, they believe Jim's my boyfriend. (In fact, so does he... anyhow another conversation for another time!).

That stated, we can play this one of two ways...
I can call and make the inquiries as to what docket numbers or archive numbers they've got. The woman was suppose to call me today, but hasn't yet. I'll give her until high noon tomorrow. Then, I can call Missouri and request that they send me copies of whatever they got. Easy peasy.

HOWEVER...
That gives them opportunity to delete shit from their files AND to omit whatever they've got. I'll find out from the D.A.'s office exactly what and where this place is (I know it's archives but WHAT exactly do they archive... that'll be key) ...

So, this leads me to scenario #2...
I can call them up, inquiring as to what they've got on Defeo. Find out what the protocol would be.
Then, I'll wait a day and call back...so that they think I'm someone else. I can find out if I showed up on their doorsteps, how long would it take to get me in a room with what they've got. Now, I say that because if I let them know I'm coming, and what I'm coming there for, that gives them ample opportunity to delete shit from the file. But if I surprise the shit out of them one day, they have no forewarning. Other side of the coin is that they may be nice men willing to help out a "dumb" woman reporter... I can play that damsell in distress card, and slightly turn on the charm.
I'm not sure what's best... I could offer to help them look for the stuff .. although I'd find it hard to believe that they wouldn't know exactly where the Defeo stuff was.

A question for you now... when you showed up at the properties bureau, what was your protocol? Did you have to wait? Were you able to just show up or did they make an appointment for you to go in?

If you want me to go to MS, I will. Problem is that I'd need for you and Diana to cover the costs... I can't swing it, unfortunately! Let me know how you want to handle this.... I'll play this in what you think is the best alternative. Let me know...thanks!
G.

*Warm Regards,*
*Gail Bleckman*
*Producing Partner,*
*Amdram Productions, Inc.*
*Cell: 631 . 334 . 1860*
*GBleckman@aol.com / AmdramProduction@aol.com*

**Attachments**

- I didn't want to send this through Facebook....eml (7.91KB)

# EXHIBIT "D"
Complaint For Declaratory Relief
Katzenbach v. Bleckman

**Subject:**  Fwd: I didn't want to send this through Facebook...

**From:**  Dianamaiocco@aol.com (Dianamaiocco@aol.com)

**To:**  katadvertising@yahoo.com;

**Date:**  Tuesday, November 9, 2010 7:53 PM


---- Forwarded Message -----

How do you feel about this?
Hey Ryan...
Who needs the threat of the government intercepting FB threads... so I'm writing to you via reg. email..

From what I've been told, they don't have anything at the D.A's office... but I'll call again just to double check. The D.A.'s office told me that all their crap was archived in MS... you may be referring to the county clerk's office, that's where I was the other day.

This is what I'm thinking...Okay. So what I mentioned to you the other day was to just keep my name in here because who knows what notes they may (or may not) have on you- and may not disclose a thing to you. Why risk it... they've got nothing on me but niceties, and they know that I'm doing a story based on the facts because of all the recent press that's been done on Amityville (human interest).. and of course, they believe Jim's my boyfriend. (In fact, so does he... anyhow another conversation for another time!).

That stated, we can play this one of two ways...
I can call and make the inquiries as to what docket numbers or archive numbers they've got. The woman was suppose to call me today, but hasn't yet. I'll give her until high noon tomorrow. Then, I can call Missouri and request that they send me copies of whatever they got. Easy peasy.

HOWEVER...
That gives them opportunity to delete shit from their files AND to omit whatever they've got. I'll find out from the D.A.'s office exactly what and where this place is (I know it's archives but WHAT exactly do they archive... that'll be key) ...

So, this leads me to scenario #2...
I can call them up, inquiring as to what they've got on Defeo. Find out what the protocol would be.
Then, I'll wait a day and call back...so that they think I'm someone else. I can find out if I showed up on their doorsteps, how long would it take to get me in a room with what they've got. Now, I say that because if I let them know I'm coming, and what I'm coming there for, that gives them ample opportunity to delete shit from the file. But if I surprise the shit out of them one day, they have no forewarning. Other side of the coin is that they may be nice men willing to help out a "dumb" woman reporter... I can play that damsell in distress card, and slightly turn on the charm.
I'm not sure what's best... I could offer to help them look for the stuff .. although I'd find it hard to believe that they wouldn't know exactly where the Defeo stuff was.

A question for you now... when you showed up at the properties bureau, what was your protocol? Did you have to wait? Were you able to just show up or did they make an appointment for you to go in?

If you want me to go to MS, I will. Problem is that I'd need for you and Diana to cover the costs. I can't swing it, unfortunately! Let me know how you want to handle this.... I'll play this in what you think is the best alternative. Let me know...thanks!
G.

Warm Regards,
Gail Bleckman
Producing Partner,
Amdram Productions, Inc.
Cell: 631 . 334 . 1860
GBleckman@aol.com / AmdramProduction@aol.com

## Attachments

- I didn't want to send this through Facebook....eml (7.91KB)

**Subject:**   Re: copying stuff...

**From:**   GBleckman@aol.com (GBleckman@aol.com)

**To:**   katadvertising@yahoo.com;

**Date:**   Monday, November 8, 2010 9:22 PM

Hey Ryan...
Just taking a wild guess at what you'd like copied, I'd say that this will be somewhere in the neighborhood of $75-100.00. One of two things... I can either wait until I get my tax refund, which may be more than a week away, or I'd need for you to lay it out. I'd probably need for you to make an electronic transfer... if you'd like, I can run down there and let you know how much this will probably cost, and then you could dump the money in. They told me the other day that it's going to cost 25 cents per page, and there's probably a good couple of hundred pages I'd need to stand there and copy.
If I could cover it I would but truth is that I don't even know how I'm covering my expenses this week. Let me know how you'd like to handle this...thanks!!

*Warm Regards,*
*Gail Bleckman*
*Producing Partner,*
*Amdram Productions, Inc.*
*Cell: 631 . 334 . 1860*
*GBleckman@aol.com / AmdramProduction@aol.com*

*In a message dated 11/8/2010 9:12:31 P.M. Eastern Standard Time, katadvertising@yahoo.com writes:*

> *Gail ---*
>
> *I'm going to reply to each of your emails separately and address the pertinent pictures:*
>
> *The document regarding the DNA testing ------ please copy.*
>
> *Nothing else here seems to be important, but I don't believe I have this DNA motion....*
>
> *-R*
>
> ---
>
> *From: "GBleckman@aol.com" <GBleckman@aol.com>*
> *To: katadvertising@yahoo.com*
> *Sent: Fri, November 5, 2010 8:25:39 PM*
> *Subject: round 2*
>
> *Some more...*
>
> *Warm Regards,*
> *Gail Bleckman*
> *Producing Partner,*
> *Amdram Productions, Inc.*
> *Cell: 631 . 334 . 1860*
> *GBleckman@aol.com / AmdramProduction@aol.com*

# EXHIBIT "E"
Complaint For Declaratory Relief
Katzenbach v. Bleckman

(470 unread) - katadvertising - Yahoo Mail                                          10/22/16, 2:42 PM



Re: Format

**Ryan Katzenbach** <katadvertising@yahoo.com>
To: John Collins

Hey John,

Put it in squeeze....

Thanks,
-R

----------------------------------------
K A T C O  M E D I A
A SCREEN ACTOR'S GUILD SIGNATORY PRODUCTION COMPANY
6404 Wilshire Boulevard, Suite 1600
Los Angeles, California 90048
310.557.6104
ryan@amityvillefilm.com • info@amityvillefilm.com
www.shatteredocumentary.com

**NOTHING IN THIS MESSAGE IS INTENDED TO CONSTITUTE AN ELECTRONIC SIGNATURE UNLESS A SPECIFIC
STATEMENT TO THE CONTRARY IS INCLUDED IN THIS MESSAGE.**

**CONFIDENTIALITY NOTICE:** *This message is intended only for the person or entity to which it is addressed. It may
contain confidential and/or privileged material. Any review, transmission, dissemination or other use, or taking of any action
in reliance upon this message by persons or entities other than the intended recipient is prohibited and may be unlawful. If
you received this message in error, please contact the sender and delete it from your computer.*

**From:** John Collins <jcollinstv@gmail.com>
**To:** katadvertising@yahoo.com; Gail Bleckman <GBleckman@aol.com>
**Sent:** Thu, May 19, 2011 9:33:39 AM
**Subject:** Format

Ryan,
I'm shooting tom'w morning w. a Panasonic 100 B as per Gail. Do you want 4 by 3 or 16 by 9 footage? If 16 by 9, do you want
me to use letterbox or squeeze mode?
JC

G. Bleckman
$300.00

Statement Period: December 25, 2010 through January 24, 2011
Account Number: 03110-43642

## ❑ Account Activity

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | **Deposits and Credits** | | |
| 12/27 | | 001016 | |
| 12/27 | | 001018 | |
| 12/30 | | 002512 | |
| 01/04 | | | |
| 01/19 | | | |
| | Total Deposits and Credits | | |
| | **Withdrawals, Transfers and Account Fees** | | |
| 12/27 | | 001019 | |
| 01/03 | | | |
| 01/04 | | | |
| 01/10 | | | |
| 01/18 | | 008361 | |
| 01/19 | | | |
| 01/24 | | 002674 | |
| 01/24 | Online Banking transfer to Chk 8589 Conf# 3089123900; Bleckman, Gail | | 300.00 |
| | Total Withdrawals, Transfers and Account Fees | | |
| | **Interest Paid** | | |
| 01/24 | Interest Paid from 12/25/10 Through 01/24/11 | | |

## ❑ Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 12/27 | | 01/04 | | 01/19 | |
| 12/30 | | 01/10 | | 01/24 | |
| 01/03 | | 01/18 | | | |

## ❑ ATM Information

This period, you visited the following ATM locations:

**Bank of America's ATM Network**
- #ICAD2308 Bank Of America, Los Angeles, CA
- #ICAD6837 Bank Of America, Los Angeles, CA
- #ICAD7212 Bank Of America, Los Angeles, CA



**Capture Date: 09/16/2011 Sequence #: 6892672311**

**DIANA MAIOCCO**
4935 BEVERLY BLVD. #16
LOS ANGELES, CA 90004

16-66-1220

**429**

Date 9/10/11

Pay to the Order of Bjoern Kells

$ 500 00

Five hundred

Dollars

**BANK OF AMERICA**
WILSHIRE LA BREA BRANCH 0311
5304 WILSHIRE BOULEVARD
LOS ANGELES, CA 90036
(323) 730-9140

for EATCO Media
Br Roll - Dive Shoot

Diana Maiocco

MP

⑆122000661⑆0429⑈03110⑈

*Transaction Service KTG Services, LLC*

506211047903 155155    20110916 000429-03110-43642
TRN_DEBIT        SHADEN          50000
Galloway 0062          94004 5062 12 0025

Electronic Endorsements

| Date | Sequence | Bank # | Endrs Type | TRN | RRC | Bank Name |
|------|----------|--------|------------|-----|-----|-----------|
| 09/16/2011 | 000000202789926 | 31201360 | -1 | Y | | TD BANK, NATIONAL AS |
| 09/19/2011 | 6512817842 | 31000040 | Undetermined | N | | FED RES BANK OF PHIL |
| 09/16/2011 | 006892672311 | 121103886 | Pay Bank | N | | BANK OF AMERICA, NA |

No Payee Endorsements Found



Capture Date: 09/13/2011 Sequence #: 6292332808



Electronic Endorsements

| Date | Sequence | Bank # | Endrs Type | TRN | RRC | Bank Name |
|------|----------|--------|------------|-----|-----|-----------|
| 09/13/2011 | 000008200717210 | 21000089 | -1 | Y | | CITIBANK, N.A. |
| 09/13/2011 | 006292332808 | 111012822 | Pay Bank | N | | BANK OF AMERICA, NA |

No Payee Endorsements Found



**Capture Date: 06/01/2011 Sequence #: 7092381011**

DIANA MAIOCCO
4935 BEVERLY BLVD. #16
LOS ANGELES, CA 90004

16-66-1220

417

Date 5/24/11

Pay to the
Order of    John Collins                    $ 250 00/XX

Two hundred fifty                           Dollars

BANK OF AMERICA
WILSHIRE-LA BREA BRANCH 6511
6204 WILSHIRE BOULEVARD
LOS ANGELES, CA 90036
(323) 730-9140

for Underwriters Comp. Due        Diana Maiocco

⑈122000661⑈0417⑈03110

1165007435  0661281 1  948  4564521  BIC

ENDORSE HER.
PAY TO THE ORDER OF
CITIBANK, N.A. BR. #464
FRANKLIN SQUARE, NY 11010
2-021000089
FOR DEPOSIT ONLY
THE COLLINS AGENCY
03072823394

Electronic Endorsements

| Date | Sequence | Bank # | Endrs Type | TRN | RRC | Bank Name |
|------|----------|--------|-----------|-----|-----|-----------|
| 06/01/2011 | 000008000541648 | 21000089 | -1 | Y | | CITIBANK, N.A. |
| 06/01/2011 | 007092381011 | 111012822 | Pay Bank | N | | BANK OF AMERICA, NA |

No Payee Endorsements Found



Capture Date: 07/15/2011 Sequence #: 5560961233

DIANA MAIOCCO
4935 BEVERLY BLVD. #16
LOS ANGELES, CA 90004

16-66-1220

421

Date 7/8/11

Pay to the
Order of    Cash    $ 100

One hundred    Dollars

BANK OF AMERICA
WILSHIRE-LA BREA BRANCH 0011
5384 WILSHIRE BOULEVARD
LOS ANGELES, CA 90036
(323) 730-9140

for  G. Bleckman

⑈12200066⑈:0421⑈0310⑈    ⑈0000010000⑈

No Electronic Endorsements Found
No Payee Endorsements Found

*$340 transfer to G.B.*



Statement Period: February 19 through March 24, 2011
Account Number: 0311█ ████

❑ **Checks Paid**        * Gap in sequential check numbers.

| Date Paid | Number | Amount |
|---|---|---|
| 03/14 | 394 | ██████ |
| 03/03 | * 397 | |
| 03/07 | 398 | |

| Date Paid | Number | Amount |
|---|---|---|
| 03/10 | 399 | ██████ |
| **Total of 4 Checks Paid** | | |

❑ **Account Activity**

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | **Deposits and Credits** | | |
| 03/04 | ████████████████ | | ███ |
| 03/13 | ████████████████ | | ███ |
| 03/21 | ATM ███████████ | 003052 | ███ |
| | | | |
| | Total Deposits and Credits | | ███ |
| | **Withdrawals, Transfers and Account Fees** | | |
| 02/22 | ████████████████ | | ███ |
| 02/23 | Online Banking transfer to Chk 8589 Conf# 4047709103; Bleckman, Gail | | 140.00 |
| 02/28 | ████████████████ | | |
| 02/28 | ████████████████ | 006607 | ███ |
| 03/03 | Bank of Americ████ (Card #3██2███) | 001443 | |
| 03/03 | ████████████████ | | |
| 03/04 | Online Banking transfer to Chk 8589 Conf# 0621433765; Bleckman, Gail | *Videographer Fee* | 200.00 |
| 03/07 | Check Card Purchase on ██/██ ██████ | | |
| 03/08 | ████████████████ | | |
| 03/11 | ████████████████ | | |
| 03/21 | ████████████████ | | |
| 03/21 | ████████████████ | | |
| 03/21 | Bank of America ATM #ICAD0837 (Card # ████) | ████ | ██ |
| | ████████████████ | | ███ |
| | **Interest Paid** | | |
| 03/24 | Interest Paid from 02/19/11 Through 03/24/11 | | |

❑ **Daily Balance**

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 02/22 | ████ | 03/07 | ████ | 03/14 | ████ |
| 02/23 | | 03/08 | | 03/18 | |
| 02/28 | | 03/09 | | 03/21 | |
| 03/03 | | 03/10 | | 03/24 | |
| 03/04 | | 03/11 | | | |



Transfer to
Gail Bleekman
$170 - misc. photocopies
+ Duplication
Suffolk County
CD - Homicide
File

Statement Period: January 25 through February 18, 2011
Account Number: ████████

## Account Activity



| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| 01/31 | **Deposits and Credits** Online Banking transfer from Chk 8589 Conf# 4249780781; Bleckman, Gail | | $170.00 |
| 02/04 | ██████████████████ | | ████ |
| 02/18 | ██████████████████ | | ████ |
| | Total Deposits and Credits | | ████ |
| 02/02 | **Withdrawals, Transfers and Account Fees** ████████████ | | ████ |
| 02/04 | ██████████████████ | | ████ |
| 02/10 | ██████████████████ | | ████ |
| | Total Withdrawals, Transfers and Account Fees | | ████ |
| 02/18 | **Interest Paid** Interest Paid from 01/25/11 Through 02/18/11 | | ██ |

## Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 01/31 02/02 | ████ | 02/03 02/04 | ████ | 02/10 02/18 | ████ |

California

*Gail Bleekman*
*$100 transfer 11/10 for photocopies*

Statement Period: October 23 through November 22, 2010
Account Number: 03110-▊▊▊▊

---

## ☐ Account Activity   Continued

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | **Withdrawals, Transfers and Account Fees** | | |
| 11/02 | ██████████████████████████████████ | | ██████ |
| 11/05 | ██████████████████████████████████████ | | ██████ |
| 11/08 | ██████████████████████████████████████████ | | ██████ |
| 11/08 | ██████████████████████████████ | 00000 | ██████ |
| 11/10 | Online Banking transfer to Chk 8589 Conf# 5140909386; Bleckman, Gail | | 100.00 |
| 11/19 | ████████████████████████████████████ | | ██████ |
| | Total Withdrawals, Transfers and Account Fees | | ██████ |
| | **Interest Paid** | | |
| 11/22 | Interest Paid from 10/23/10 Through 11/22/10 | | $.08 |

---

## ☐ Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 10/25 | ██████ | 11/03 | ██████ | 11/10 | ██████ |
| 10/28 | | 11/04 | | 11/19 | |
| 11/01 | | 11/05 | | 11/22 | |
| 11/02 | | 11/08 | | | |

---

## ☐ ATM Information

This period, you visited the following ATM locations:

**Bank of America's ATM Network**
- #ICAD6837 Bank Of America, Los Angeles, CA
- #ICAD7212 Bank Of America, Los Angeles, CA

California

# EXHIBIT "F"
Complaint For Declaratory Relief
Katzenbach v. Bleckman

**Subject:** Fwd: Hi Bill...

**From:** GBleckman@aol.com (GBleckman@aol.com)

**To:** katadvertising@yahoo.com;

**Date:** Thursday, April 21, 2011 8:49 AM

Response from Bill... let me know how you'd like to next approach this... thanks!
G.

*Warm Regards,*
*Gail Bleckmankat*
*Producing Partner,*
*Amdram Productions, Inc.*
*Cell: 631 . 334 . 1860*
*GBleckman@aol.com / AmdramProduction@aol.com*

Hi Gail,
 Your plan sounds pretty comprehensive. The Cole St target seems the logical choice. Canals are occasionally dredged if boat navigation becomes compromised. This would most likely be a private project. The SCWA supplies drinking water only, has nothing to do with waterways. Waterways are the domain of the individual towns, with DEC, EPA and Army Corps of Engineers oversight. Those would be the places to contact for information on dredging history. We can do the initial survey whenever you are ready. As soon as you have made arrangements for film documentation we can proceed............Bill

*Hi Gail,*
 *To address the questions posed in your email:*

*Yes, on the first day we will go and do an underwater survey of the sites. If conditions permit, we will do a search, although it is highly unlikely that we will find anything. I expect the bottom to be deep, deep mud, and our target will be buried. Of course, we could get lucky. We can discuss how you would want us to handle that eventuality.*

 *The next step would be to inform the electronic surveyors about the conditions in the search area. This will allow them to formulate a plan to do a thorough electronic map of the area, showing the exact location of all metallic items within, including deep under the mud. At this point you can negotiate with them for their services.*

 *Next, if you reach an agreement with the surveyors, we set up the equipment and map the bottom. In this circumstance it could most likely be*

*done in a single day. The data would then be evaluated and our targets identified.*

*Next we put divers in the water wearing military grade GPS devices. These are accurate to within 2 inches. Using the coordinates from the search, we guide them to our targets and they dig them up. In this manner we will be able to either find the target, or prove conclusively that it is not in the target area.*

*We would need to be on site on three separate days. The timing would be up to you and the surveyors, but realistically I expect that these days would be at least 2 weeks apart. It could all happen much faster, but would probably be more expensive if the surveyors need to make it a priority. They are very active worldwide.*

*The last component is the underwater film crew. If you are planning on hiring a film crew locally for this project for the topside work, our guys may be available. The are willing to donate a bit of time to us for this project, if it gets more involved then they would need some compensation. I can put you in touch with them and you can discuss the details.*

*Well, that should cover it for now, looking forward to hearing from you!................Bill*

**Subject:**   Re: Richmond/Coles Ave.

**From:**   GBleckman@aol.com (GBleckman@aol.com)

**To:**   katadvertising@yahoo.com; Dianamaiocco@aol.com;

**Date:**   Wednesday, April 20, 2011 6:52 PM

Fuck, I meant Bill.... I keep calling this guy Dave, unreal... okay, writing him now! :)

*Warm Regards,*
*Gail Bleckman*
*Producing Partner,*
*Amdram Productions, Inc.*
*Cell: 631 . 334 . 1860*
*GBleckman@aol.com / AmdramProduction@aol.com*

*In a message dated 4/20/2011 1:48:03 P.M. Pacific Daylight Time, katadvertising@yahoo.com writes:*

> Gail,
>
> **Rethinking this today after talking to Geraldine.**
>
> **She points out that Butch was so ignorant that he put both the holster for the handgun and the soft case for the rifle in the sewer drain TOGETHER; she thinks that a re-survey of the Richmond Dock is in order and after thinking about it, I agree.  As I understand the report, Butch threw the rifle off the northeast corner of the dock; therefore, I am thinking maybe we should survey the southeast corner for the handgun -- you just never know.**
>
> **I am inclined the believe, however, that the handgun will be off the Coles Ave bulkhead.  I have the strange feeling that the rag that was in the wastecan, which had blood on it, was used to wrap the revolver.  I think after he tossed it in the water, he threw the rag in the trashcan.  There can be no other logical explanation for WHY this rag was in the trash and I can't believe that 36 years later it's just occurring us to check for the second gun which I am sure was used in the crime.**
>
> **The only other thing that might affect the survey area is IF the canal has been dredged, as we talked about.  It will be really, really interesting to hear what Bill thinks.**
>
> **-R**
>
> ------------------------------------------
> **K A T C O** M E D I A
> A SCREEN ACTOR'S GUILD SIGNATORY PRODUCTION COMPANY
> 5404 Wilshire Boulevard, Suite 1300
> Los Angeles, California 90048
> 310.587.0104
> ryan@amityvillefilm.com ● info@amityvillefilm.com
> *www.shattereddocumentary.com*
>
> **NOTHING IN THIS MESSAGE IS INTENDED TO CONSTITUTE AN ELECTRONIC SIGNATURE UNLESS A SPECIFIC STATEMENT TO THE CONTRARY IS INCLUDED IN THIS MESSAGE.**
>
> **CONFIDENTIALITY NOTICE: This message is intended only for the person or entity to which it is addressed. It may contain confidential and/or privileged material. Any review, transmission, dissemination or other use, or taking of any action in reliance**

*upon this message by persons or entities other than the intended recipient is prohibited and may be unlawful. If you received this message in error, please contact the sender and delete it from your computer.*

# EXHIBIT "G"
Complaint For Declaratory Relief
Katzenbach v. Bleckman

To: YVONNE I. MILEWSKI, M.D.
Suffolk County Chief Medical Examiner

From: Gail Bleckman
Producer, Katco Media
Re: SCPD CV#74-340868

Dear Dr. Milewski;                                                                    March 21st, 2011

Thank you so very much for taking the time from your day to review my request.

I am an independent producer who was hired to assist in producing a documentary on the Defeo murders from 1974. The project entitled *Shattered Hopes: The True Story of the Amityville Murders* depicts the true story of a Long Island family in turmoil who, unfortunately, was slain in the wee hours on that 1974 autumn night. Narrated by Emmy-Award winning actor Edward Asner, the documentary portrays the tale behind a completely disturbed individual (Ronnie "Butch" Defeo) who has, over the years, told so many lies and fabrications about the murder of his family that it's enough to make one's head spin more times than Linda Blair's in The Exorcist!

It is our position at Katco Media that Ronnie "Butch" Defeo is EXACTLY where he belongs; in prison for the rest of his natural life. God willing, the rest of his days will be spent in a torturous, horrific manner... just as his family was subjected to over 36 years ago. The very thing about this story is that still, to this very day, people disturb the neighborhood as well as the occupants of that house, passing by the former 112 (now 108) Ocean Ave. in Amityville so as to take a picture or just a glimpse, of where these deplorable murders took place. As I'm sure you are aware, a future hoax was the bi-product of this revolting case and spawned *The Amityville Horror* franchise; a half a billion dollar brand that was birthed from one couple's narcissistic, greed-ridden hands. Additionally, there have been countless documentaries about this entire franchise (I lost count!) whether in a bio-pic, feature film, or documentary slated for TV series special. I know I can speak for Shattered Hopes Writer/ Producer/ Director Ryan Katzenbach, and Exec. Producer Diana Maiocco, when I state that we are of the opinion that this beautiful town of Amityville will never rest until the truth... the ENTIRE truth... is told. That is our mission; that is our goal. We are on the side of the truth of that horrible night in November, 1974, whichever way the cookies crumble.

Ryan has assembled a 36-man forensic team who has examined all of the evidence... all paperwork, crime scene photos and any sub sequent data which we obtained and was imperative in the 1975 Defeo trial. We have obtained a very qualified psychiatric team who has profiled each Defeo family member; these folks have also worked on some very notable cases such as Jon Benet Ramsey, The Unabomber, Gacy, Bundy, etc., and are more than qualified to conclude based upon examination of evidence.

A few weeks back, we (my camera crew and I) were granted permission via FOIL request to film some pieces of evidence for this case from the Suffolk County Property's Bureau. At the time of filming I was informed that I could film some evidence in a specific manner which turned out to not be the case. This material was put in new plastic bags, labeled "bio-hazardous", and not taken out of the bags, so my job was a bit harder due to glare of the bags under the lights in the filming process.

In doing so, we uncovered a piece of evidence of which we would love to acquire more forensic information; "Item #29 Plastic bag containing bloodied clothing named Dawn Defeo". If you obtain a copy of the inventory from the SCPD legal department, you'll see that her nightgown (along with all of the other victim's clothing) was listed on the completed property's list. My request to you is simply this; for the sake of depicting this story as accurately as possible, we would love to film a medical examiner or a forensic analysis of said garment, Dawn Defeo's clothing. By any chance, do you have a researcher within your department who could examine this evidence? What is the correct protocol for this sort of request? Not working in Suffolk County government, I am unfamiliar with the intricacies of the correct modus operandi. If you could enlighten me as to how to go about getting this investigation underway, I would so very much appreciate that! Or, if you need an official FOIL request, please consider this letter as such.

Thank you, once again, for taking the time from your day to review my request. I believe that in order to depict this story in complete, accurate truth, the filming of Dawn's clothing will reveal details about this case that will finally let the beautiful village of Amityville forever rest from the nuisances of the past 36 or so years. That is our mission; that is our goal.

Best,
Gail Bleckman
Producer, *Shattered Hopes: The True Story of the Amityville Murders*
Kacto Media.

# EXHIBIT "H"

Complaint For Declaratory Relief
Katzenbach v. Bleckman

**Subject:**   Re: Contract

**From:**   Ryan Katzenbach (katadvertising@yahoo.com)

**To:**   Gbleckman@aol.com;

**Date:**   Wednesday, October 17, 2012 12:31 PM

*Contract Sent*

Contract attached, but again, need the things at the end before it can be executed.

-R

-------------------------------------------------------------------------------------------------------------------------------------------

**Katco** Media                    **Amityville Holdings, Inc.**

A SCREEN ACTOR'S GUILD SIGNATORY PRODUCTION COMPANY    A CALIFORNIA CORPORATION
6404 Wilshire Boulevard, Suite 1800                6404 Wilshire Boulevard, Suite 1805
Los Angeles, California 90048 • United States of America    Los Angeles, California 90048 • United States of America
ryan@amityvillefilm.com • info@amityvillefilm.com
www.shattereddocumentary.com

**NOTHING IN THIS MESSAGE IS INTENDED TO CONSTITUTE AN ELECTRONIC SIGNATURE UNLESS A SPECIFIC STATEMENT TO THE CONTRARY IS INCLUDED IN THIS MESSAGE.**

**CONFIDENTIALITY NOTICE:** *This message is intended only for the person or entity to which it is addressed. It may contain confidential and/or privileged material. Any review, transmission, dissemination or other use, or taking of any action in reliance upon this message by persons or entities other than the intended recipient is prohibited and may be unlawful. If you received this message in error, please contact the sender and delete it from your computer.*

**From:** "Gbleckman@aol.com" <Gbleckman@aol.com>
**To:** "katadvertising@yahoo.com" <katadvertising@yahoo.com>
**Sent:** Wednesday, October 17, 2012 10:07 AM
**Subject:** Re: Contract

Ryan, you have asked this of me before, in which I gave you my address.
If you have a contract (and I say IF because now, I don't believe you ever had one drawn up at all) then email it to me. For this you do not need my address. Also, do not forget a copy of the financial statements, which include number of units sold along with every means of distribution.
If this is not emailed to me today, my attorney (with whom I am sitting in front of right now) will be handling this from here on in.
Gail.

Sent from my HTC smartphone on the Now Network from Sprint!


----- Reply message -----
From: "katadvertising@yahoo.com" <katadvertising@yahoo.com>
To: <GBleckman@aol.com>
Subject: Contract
Date: Wed, Oct 17, 2012 1:06 am

*entities other than the intended recipient is prohibited and may be unlawful. If you received this message in error, please contact the sender and delete it from your computer.*

**From:** "GBleckman@aol.com" <GBleckman@aol.com>
**To:** katadvertising@yahoo.com
**Sent:** Wednesday, October 24, 2012 12:40 PM
**Subject:** Re: Where are we at?

I need to set aside some time for review, as other more pressing things have taken priority. Will get to it soon.

In a message dated 10/23/2012 8:48:13 P.M. Eastern Daylight Time, katadvertising@yahoo.com writes:

> Gail,
>
> Haven't heard from you since delivering the contract.
>
> What are we doing and where are we at?
>
> -R
>
> ------------------------------------------------------------------------------------------------

**Katco**Media                          **Amityville Holdings, Inc.**
A SCREEN ACTOR'S GUILD SIGNATORY PRODUCTION COMPANY
  A CALIFORNIA CORPORATION
6404 Wilshire Boulevard, Suite 1800 6404 Wilshire Boulevard, Suite 1805
Los Angeles, California 90048 • United States of America Los Angeles, California 90048 • United States of America
.rvan@amityvillefilm.com • info@amityvillefilm.com
www.shattereddocumentary.com

NOTHING IN THIS MESSAGE IS INTENDED TO CONSTITUTE AN ELECTRONIC SIGNATURE UNLESS A SPECIFIC STATEMENT TO THE CONTRARY IS INCLUDED IN THIS MESSAGE.

CONFIDENTIALITY NOTICE: *This message is intended only for the person or entity to which it is addressed. It may contain confidential and/or privileged material. Any review, transmission, dissemination or other use, or taking of any action in reliance upon this message by persons or entities other than the intended recipient is prohibited and may be unlawful. If you received this message in error, please contact the sender and delete it from your computer.*

# EXHIBIT "I"
Complaint For Declaratory Relief
Katzenbach v. Bleckman

**Subject:**   Re: Hi Ryan...

**From:**   Ryan Katzenbach (katadvertising@yahoo.com)

**To:**   GBleckman@aol.com;

**Date:**   Thursday, October 30, 2014 2:05 PM


Gail,

I sent you a contract that you have not signed.  Please sign and return so I can put it in the "executed" folder.  Once I have the contract in file, then I can issue you a check for royalties in November as we've now exceeded the $50,000.00 clause.

I prefer that all discussions between you and I take place in written form, via email.

Best,
Ryan Katzenbach


On Thursday, October 30, 2014 2:01 PM, "GBleckman@aol.com" <GBleckman@aol.com> wrote:


Hi Ryan...

I hope this note finds you well and in good spirits.

I am trying to touch base with you in order to figure out where we are, in terms of the Amityville project, and contract, etc. In doing so, I called the phone number which I had for you, and as you know, you can no longer be reached on that number. I have left a voicemail on Dan (the SH publicists) phone.

Please forward me your current phone number and contact info, and do give me a call at your earliest convenience. Thank you.

Best,
Gail


Warm Regards
Gail Bleckman
(o) 631. 509. 4397
(c) 631-334-1860

President, Executive Producer
12 Things Productions, LLC.
a New York State Limited Liability Company
JBleckman@aol.com
http://www.imdb.com/name/nm4294517
http://www.linkedin.com/pub/gail-bleckman/31/1/90b



.

# EXHIBIT "J"
Complaint For Declaratory Relief
Katzenbach v. Bleckman

**Subject:**   FW: Hi Rob... re: Ryan Katzenbach...

**From:**   Steve Cheskin (Scheskin@reelzchannel.com)

**To:**   katadvertising@yahoo.com;

**Date:**   Monday, November 10, 2014 1:54 PM

See below.

Keith Knee also recently told me he was the Producer...

**From:** Rob Swartz

**From:** <GBleckman@aol.com>
**Date:** Mon, 10 Nov 2014 16:47:28 -0500
**To:** Robert Swartz <rswartz@reelz.com>
**Subject:** Hi Rob... re: Ryan Katzenbach...

Dear Rob...
Great speaking with you just now!

I am trying to touch base with Ryan Katzenbach, Producer of
The Amityville Horror Murders; a project which I co-produced.
I do not have any current contact information, so would you
or any of your associates at Reelz have his current address
and phone number? I need a physical address for him because
I need to send him hard copies of papers which he requested
of me a while back, and I have no current address or phone.

I would appreciate any and all assistance in this matter.
Thank you!
Best, Gail

Warm Regards
Gail Bleckman
(o) 631. 509. 4397
(c) 631-334-1860

President, Executive Producer
12 Things Productions, LLC.
a New York State Limited Liability Company  GBleckman@aol.com http://www.imdb.com/name/nm4204017
http://www.linkedin.com/pub/gail-bleckman/10/139/60b

# EXHIBIT "K"
Complaint For Declaratory Relief
Katzenbach v. Bleckman

**Subject:**  Re: Gail Bleckman

**From:**  Ryan Katzenbach (katadvertising@yahoo.com)

**To:**  rmcpeters@reelzchannel.com;

**Date:**  Tuesday, March 10, 2015 4:12 PM

I'm personally not worried about her......she has refused to share her contact info with me, as well, so any claims that she can make about not getting paid, contract, etc.,. are all moot because she has refused my repeated statements to her that she needs to communicate in writing with me. Keith told me that she told him, yet again, that she cannot get in touch with me, which is a flagrant lie. IF this becomes an issue later on, our legal counsel, Rick Walden, is up to speed on the issue and if necessary, she will get contacted by him with an order to cease and desist.

Ahhhh, the fun of producing.

-R

---

**From:** Robyn Mc Peters <rmcpeters@reelzchannel.com>
**To:** Ryan Katzenbach <katadvertising@yahoo.com>
**Sent:** Tuesday, March 10, 2015 3:52 PM
**Subject:** Re: Gail Bleckman

Hi Ryan,

Well, since my personal email address is an AOL account, I know that if her account was closed or otherwise not functional that we would have received an auto reply stating as much. So, for now, we consider her informed. To my knowledge, the only person to whom she has ever spoken with at REELZ is our programming exec, Rob Swartz, some time last year. I made all members of our exec team aware that they can send any future incoming calls to me but I'm really not expecting any to come in.

Robyn

Sent from my iPad

On Mar 10, 2015, at 3:46 PM, "Ryan Katzenbach" <katadvertising@yahoo.com> wrote:

Hey Robyn,

Keith, our other producer, called me yesterday and said that Gail called him. Curiously, she was ranting about me to him, but said NOTHING about the email you had sent and seemed to have had no knowledge of the Emmy nod. She told Keith that "I'm taking Katzenbach down," and insinuated that I used footage that did not belong to me that she shot (apparently of the Suffolk County Property Division). However, when Keith pointed out to her that SHE did not shoot that footage and that we had paid videographers for their work, she seemed to back down a bit. She also told Keith that she has powerful friends at Reelz Channel that love her and that they're going to assist in bringing me down.....HAHAHA.....

Just thought I would share, a sort of "heads up."  However, she did not say anything about the Emmy, so apparently her aol email is no longer working.....

-R

**Subject:** RE: Category 29 Writing and Category 34 Editing essays

**From:** Rachel Bass (RBass@reelzchannel.com)

**To:** katadvertising@yahoo.com;

**Date:** Thursday, February 26, 2015 4:40 PM

Also, please send me the contact information for all entrants (listed below) whenever you're able since I need that information to even begin the submission form for each category.

FYI I haven't gotten confirmation for Pfeiffer or the Aqua Survey team yet-- our academy contact said "congrats, you've stumped the band on this one!!" so he will let me know what the ruling is on them within the next few days.

Thank you!

1.   **Contact info (email addresses, phone numbers and addresses) for all producers/entrants relevant to the selected categories** (research, cinematography, etc.):
   a.   Ryan Katzenbach
   b.   Keith Knee
   c.   Gail Bleckman
   d.   Ansley Snitkin
   e.   Ron Katzenbach
   f.   Jared Katzenbach
   g.   Bill Pfeiffer
   h.   Diana Maiocco
   i.   Dr. Eric Hickey
   j.   Dr. Kathleen Puckett
   k.   J.P. Pierce
   l.   Ken Hayes (AquaSurvey)
   m.   Mark Padover (AquaSurvey)
   n.   Kyle Kingman (AquaSurvey)

**From:** Ryan Katzenbach [mailto:katadvertising@yahoo.com]
**Sent:** Thursday, February 26, 2015 5:17 PM
**To:** Rachel Bass
**Subject:** Re: Category 29 Writing and Category 34 Editing essays

Reviewing these now - and it just occurred to me I have to find the script and get you a copy of that as well.

QUESTION: does the script have to match the special EXACTLY?  A lot of changes were made in the edit stage that are not reflected in the script....do we need exact or will "close" work?

**From:** Rachel Bass <RBass@reelzchannel.com>
**To:** "Ryan Katzenbach <katadvertising@yahoo.com> (katadvertising@yahoo.com)" <katadvertising@yahoo.com>
**Sent:** Thursday, February 26, 2015 4:10 PM
**Subject:** Category 29 Writing and Category 34 Editing essays

Hi Ryan,

Please find the two essays attached for the Writing and Editing categories. Please note I've added a comment to each of the essays. If you're able to quantify/estimate the amount of sources used in writing the script or the hours spent editing/overlaying photos within the documentary it may be worth noting. If it would be too complicated to come up with an accurate number no worries, but thought I'd check.

Just two more essays after this!

Thank you again,
Rachel



**Rachel Bass**
**Coordinator**
**Public Relations**
**5650 University Boulevard, SE**
**Albuquerque, NM 87106**
**505-212-8809 (o)**



Watch REELZ on DIRECTV 238HD, Dish Network 299HD, Verizon FiOS 233,
AT&T U-verse 799/1799HD and in HD on cable systems nationwide.
Find REELZ on your local cable or satellite provider at

# EXHIBIT "L"

Complaint For Declaratory Relief
Katzenbach v. Bleckman

**Subject:**   Amityville Contract and Royalty Payment

**From:**   Ryan Katzenbach (katadvertising@yahoo.com)

**To:**   gbleckman@aol.com; scheskin@reelzchannel.com;

**Date:**   Wednesday, July 8, 2015 4:12 PM


Gail,

I am advised that you are trying to obtain information and payment regarding the special that aired on Reelz. I am asking you, in the future, to keep any and all communications between you and I as I am the party to whom you have an agreement with.  I am optimistic that we can resolve this issue, but there are things that I must have before we can issue a royalty check to you.

As you know, the contract for this project was sent to you on October 12, 2012.  You, at that time, advised me that you might have a few issues with the agreement and advised me that your entertainment attorney would be in touch.  I never heard back again.  Looking back through the archive of emails and correspondence, you then contacted me on October 30, 2014 wherein we shared 3 email exchanges; then again on November 10, 2014 wherein we shared 4 more email exchanges wherein I advised you, multiple times on both occasions, to have your attorney contact me directly via email.  To date, that has never happened.

If you wish to be paid the royalty to which we've agreed, then you need to do the following things:

1.  Execute the contact by signing it and returning it; an electronic, scanned copy, complete with signatures in ALL signature blanks will suffice until we receive the hard copy;

2. I need a copy of your current identification/driver's license number that identifies your current legal address.

3.  I need your current phone number, and you need to keep this current with us at all times.

4.  I need a completed I9 or W9, depending upon whether you use a social security number of taxpayer identification EIN for the purposes of issuing a year-end 1099;

Once I have ALL of these things, I am happy to render a royalty statement to you along with a check for the royalty.

Cordially,
Ryan Katzenbach

# EXHIBIT "M"

Complaint For Declaratory Relief
Katzenbach v. Bleckman

**Subject:**   Re: "Shattered Hopes..."/Gail Bleckman

**From:**   Ryan Katzenbach (katadvertising@yahoo.com)

**To:**   philip@philipwildlaw.com;

**Date:**   Tuesday, September 8, 2015 7:41 PM

Do what you feel the need to do.

Sent via the Samsung GALAXY S® 5, an AT&T 4G LTE smartphone

<br><br>-------- Original message --------<br>From: Philip Wild &lt;philip@philipwildlaw.com&gt; <br>Date:09/08/2015 7:24 PM (GMT-08:00) <br>To: Ryan Katzenbach &lt;katadvertising@yahoo.com&gt; <br>Cc: karategirl2001@aol.com, Gail Bleckman &lt;GBleckman@aol.com&gt; <br>Subject: Re: "Shattered Hopes..."/Gail Bleckman <br><br>
Okay, I understand.

For the record:

-- I have reviewed the correspondence and it does not support any of your purported causes of action.

-- Your analysis of jurisdiction and venue is incorrect. Your claim that "this agreement was executed in California and thus jurisdiction and venue is here" is clearly incorrect since you know the purported "contract" was never in fact executed.

-- Your assertion that my client has no copyright claim since you paid some expenses is contrary to the terms of basic copyright law and the requirements of Section 101 of the Copyright Act.

I urge you to consult a lawyer and reconsider your position.  If you have something to constructive to offer, we would still be willing to consider your responses to our comments until the close of business on Friday, September 11, 2015.  If you are not willing to negotiate in good faith, please don't bother responding to my draft.

This email is without prejudice to my client's rights and remedies, in law and in equity, all of which are expressly reserved.

Philip Wild

---------------------------------------------------

Philip Wild Law, PC

5 Columbus Circle, 8th Floor, NY, NY 10019
phone:  212-709-8140
fax: 212-943-2300
cell:  917-318-2093
Qualified in New York and New Jersey

*This email message is intended only for the use of the individual or entity named above and may contain information which is confidential, non-public, or legally privileged. Any dissemination or distribution of this message other than to its intended recipient is strictly prohibited. If you have received this message in error, please notify us by telephone immediately and promptly destroy and delete the original and all copies.*

On Tue, Sep 8, 2015 at 7:56 PM, Ryan Katzenbach <katadvertising@yahoo.com> wrote:

Mr Wild:

Trust me -- you have NO IDEA of the garbage that I have put with up from your client.  I AM acting in good faith by being willing to sign the contract and pay her when what I should be doing is calling my attorney and having him file an action against her just for the garbage she pulled with Reelz Channel -- especially this last stunt she pulled in calling Stanley Hubbard's office.

My "reasonable" offer to sign the contract as is, we'll execute it, and pay Ms. Bleckman.

IF by "complicate" the transaction you are inferring litigation, be sure to know that this agreement was executed in California and thus jurisdiction and venue is here; that Ms. Bleckman will have a hard time satisfying the requirements of diversity under federal law if she attempts to sue me in New York State.  Also, be advised, that I have every email communication with Ms. Bleckman and we will respond with a counterclaim alleging breach of contract, breach of fiduciary duty, defamation, false light defamation, and interference with perspective economic advantage.  As far as copyright claims, Ms.

Bleckman has NO copyright claim to this project.  We paid for all the materials she obtained; we paid for the footage that was shot (we have the cancelled checks / deposit slips to her account) and that material is OURS.

Sign the contract and return it, get paid....OR....your call.

-R

**From:** Philip Wild <philip@philipwildlaw.com>
**To:** Ryan Katzenbach <katadvertising@yahoo.com>
**Sent:** Tuesday, September 8, 2015 4:34 PM
**Subject:** Re: "Shattered Hopes..."/Gail Bleckman

Dear Mr. Katzenbach,

I understand there is frustration and anger on both sides of this negotiation.

Still, unless you want to make this transaction far more trouble than it's worth, I strongly suggest you respond reasonably to our proposal as opposed to using this as an opportunity to rant against my client.

My client is a credited producer who made significant creative contributions to the work, which means she has a copyright interest in the project.  You have exploited the project without signed written  authorization from her. I'm sure your lawyer can advise you as to how this could play out if you refuse to negotiate.

The spirit of our comments is to put this all in the past, finalize a fair deal based on what were my client's reasonable expectations at the time, get my client paid and be done with it.

If you are acting in good faith as you claim, I would think this would be your goal as well.

Regards,

Phil

On Sep 8, 2015, at 4:02 PM, Ryan Katzenbach <katadvertising@yahoo.com> wrote:

Mr. Wild:

As I advised you last week, I am in the middle of an extensive shoot and just returning to the office today.  I have an extensive reply coming your way.  When I get around to sending it, I will do so.

Your client has certainly not worried about the need to "wrap it up quickly" since she's waited three years to contact us, even after I advised her multiple times to do so.  Therefore, I do not appreciate being pushed for a reply, nor do I respond well to having deadlines imposed upon me.

At this point, while my more detailed response will outline my problems with the conduct and behavior of your client, her breach of fiduciary duties and contractual obligations; her libel, slander, and defamation of myself, I will tell you that none of the changes you have proposed are agreed to, nor will they be made on our end.  I note that Ms. Bleckman has omitted the "confidentiality" rider of the contract because, as I am sure she will not admit to you, she had breached this basic fiduciary duty repeatedly by divulging details of the project to others.  Her contact with the Reelz network and statements made to certain execs at Reelz, as far as I am concerned, are absolute defamation and, I will also assert, flagrant lies since she had been in contact with me via email when she elected to approach the network and asset that she couldn't reach me.

In short, Ms. Bleckman can execute the contract as submitted, in entirety, OR not at all.  If she wishes to submit the executed contract, then we will issue a royalties earning statement and remit payment.  If she does not wish to return the contract, then that is on her.  The time to revise the contract or raise issues with any language contained within it has long ago passed.  Furthermore, I am not agreeing to anything that states she has satisfactorily performed her duties; nor will I agree to any language that gives her right to an audit.  Mr. Wild, "A" list actors do not get the right to audit a studio, and your client is not entitled to such either.

Very Truly Yours,
Ryan Katzenbach

**From:** Philip Wild < hil@philipwildlaw.com >
**To:** Ryan Katzenbach < hiladvertising@vahoo.com >
**Cc:** Diana < dianamaloou@aol.com >; Gail Bleckman < GBleckman@aol.com >
**Sent:** Tuesday, September 8, 2015 10:25 AM
**Subject:** Re: "Shattered Hopes..."/Gail Bleckman

Dear Ryan,

I hope you had a good Labor Day weekend.

I know this matter has been outstanding for a while but, now that we are all focusing on it, it would be great to wrap it up quickly.

As you can imagine, regardless of the status the formal contract, my client rendered her services long ago and needs to be paid what is due as soon as possible.

Under the circumstances, we would appreciate it if you would reply no later than this Friday, September 11.

Thank you.

Regards,

Phil

------------------------------------------------------
Philip Wild Law, P.C.
5 Columbus Circle, 8th Floor, NY, NY 10019
phone:  212-709-8140
fax: 212-943-2300
cell:  917-318-2093
Qualified in New York and New Jersey

*This email message is intended only for the use of the individual or entity named above and may contain information which is confidential, non-public, or legally privileged. Any dissemination or distribution of this message other than to its intended recipient is strictly prohibited. If you have received this message in error, please notify us by telephone immediately and promptly destroy and delete the original and all copies.*

On Tue, Sep 1, 2015 at 8:09 PM, Philip Wild <philip@philipwildlaw.com> wrote:

Dear Ryan,

Thank for your reply.

I am surprised by your statement that my client is seeking to "renegotiate" previously agreed terms. Based on my discussions with Ms. Bleckman and my review of the correspondence, it appears that only two money points were agreed: a royalty for Ms. Bleckman of 5% of gross receipts after recoupment, and a deemed recoupment point of $50,000 in gross receipts.

If you have any correspondence documenting any other agreed financial points, please forward it to me soon as possible so I can discuss with my client.

In the meantime, I look forward to receiving your comments and wrapping this up.

Best regards,

Phil

---------------------------------------------------------

Philip Wild Law, PC
5 Columbus Circle, 8th Floor, NY, NY 10019
phone:  212-709-8140
fax: 212-943-2300
cell:  917-318-2093
Qualified in New York and New Jersey

*This email message is intended only for the use of the individual or entity named above and may contain information which is confidential, non-public, or legally privileged. Any dissemination or distribution of this message other than to its intended recipient is strictly prohibited. If you have received this message in error, please notify us by telephone immediately and promptly destroy and delete the original and all copies.*

On Tue, Sep 1, 2015 at 4:11 PM, Ryan Katzenbach <katadvertising@yahoo.com> wrote:

Philip:

Thank you for your email.  I am just coming off an extensive film shoot and finally looking over emails and such and heading back into another shoot later this week.  It might take a few days to review all of what you have submitted.

Generally, at first glance, I am not agreeable to Bleckman's proposed changes.  Thirty-four months after the delivery of the contract, it appears Ms. Bleckman is intending to renegotiate the terms we already agreed to, which is typical of the overtly bad-faith she has **repeatedly** demonstrated.

I will be sending a THOROUGH email detailing our exact position on the proposed changes.

Ryan Katzenbach

**From:** Philip Wild <philip@philipwildlaw.com>
**To:** katadvertising@yahoo.com; karategirl2001@aol.com
**Cc:** Gail Bleckman <GBleckman@aol.com>
**Sent:** Monday, August 31, 2015 3:12 PM
**Subject:** "Shattered Hopes..."/Gail Bleckman

Dear Ryan and Diana,

I represent Gail Bleckman.

At Gail's request, I have attached a marked a copy of the agreement you originally prepared showing our proposed revisions (please excuse the formatting glitches).

I look forward to hearing from you or your attorney at your earliest convenience.

In the meantime, I reserve my client's rights generally and her right to make further revisions.

Best regards,

Phil

--------------------------------------------------------

Philip Wild Law P.C.
5 Columbus Circle, 8th Floor, NY, NY 10019
phone:  212-709-8140
fax: 212-943-2300
cell:  917-318-2093
Qualified in New York and New Jersey

*This email message is intended only for the use of the individual or entity named above and may contain information which is confidential, non-public, or legally privileged. Any dissemination or distribution of this message other than to its intended recipient is strictly prohibited. If you have received this message in error, please notify us by telephone immediately and promptly destroy and delete the original and all copies.*

Okay, I understand.

For the record:

-- I have reviewed the correspondence and it does not support any of your purported causes of action.

-- Your analysis of jurisdiction and venue is incorrect. Your claim that "this agreement was executed in California and thus jurisdiction and venue is here" is clearly incorrect since you know the purported "contract" was never in fact executed.

-- Your assertion that my client has no copyright claim since you paid some expenses is contrary to the terms of basic copyright law and the requirements of Section 101 of the Copyright Act.

I urge you to consult a lawyer and reconsider your position.  If you have something to constructive to offer, we would still be willing to consider your responses to our comments until the close of business on Friday, September 11, 2015.  If you are not willing to negotiate in good faith, please don't bother responding to my draft.

This email is without prejudice to my client's rights and remedies, in law and in equity, all of which are expressly reserved.

Philip Wild

-------------------------------------------------------
Philip Wild Law, P.C.
5 Columbus Circle, 8th Floor, NY, NY 10019
phone: 212-709-8140
fax: 212-943-2300
cell: 917-318-2093
Qualified in New York and New Jersey


This email message is intended only for the use of the individual or entity named above and may contain
information which is confidential, non-public, or legally privileged. Any dissemination or distribution of this
message other than to its intended recipient is strictly prohibited. If you have received this message in error,
please notify us by telephone immediately and promptly destroy and delete the original and all copies.

On Tue, Sep 8, 2015 at 7:56 PM, Ryan Katzenbach <katadvertising@yahoo.com> wrote:
Mr Wild:

Trust me -- you have NO IDEA of the garbage that I have put with up from your client.  I AM acting in good
faith by being willing to sign the contract and pay her when what I should be doing is calling my attorney and
having him file an action against her just for the garbage she pulled with Reelz Channel -- especially this last
stunt she pulled in calling Stanley Hubbard's office.

My "reasonable" offer to sign the contract as is, we'll execute it, and pay Ms. Bleckman.

IF by "complicate" the transaction you are inferring litigation, be sure to know that this agreement was
executed in California and thus jurisdiction and venue is here; that Ms. Bleckman will have a hard time
satisfying the requirements of diversity under federal law if she attempts to sue me in New York State.  Also,
be advised, that I have every email communication with Ms. Bleckman and we will respond with a
counterclaim alleging breach of contract, breach of fiduciary duty, defamation, false light defamation, and
interference with perspective economic advantage.  As far as copyright claims, Ms.

Bleckman has NO copyright claim to this project.  We paid for all the materials she obtained; we paid for the
footage that was shot (we have the cancelled checks / deposit slips to her account) and that material is
OURS.

Sign the contract and return it, get paid....OR....your call.

-R

From: Philip Wild <philip@philipwildlaw.com>
To: Ryan Katzenbach <katadvertising@yahoo.com>
Sent: Tuesday, September 8, 2015 4:34 PM
Subject: Re: "Shattered Hopes..."/Gail Bleckman

Dear Mr. Katzenbach,

I understand there is frustration and anger on both sides of this negotiation.

Still, unless you want to make this transaction far more trouble than it's worth, I strongly suggest you respond
reasonably to our proposal as opposed to using this as an opportunity to rant against my client.

# EXHIBIT "N"
Complaint For Declaratory Relief
Katzenbach v. Bleckman

# THE KERNAN LAW FIRM

9663 Santa Monica Blvd. Suite 450
Beverly Hills, CA 90210

Stephen M. Kernan, Esq.
Direct: (310) 490-9777
Facsimile: (310) 861-0503
mkernan@kernanlaw.net

Adjunct Professor of
Entertainment Law
University of California,
Hastings College of Law

September 30, 2016

## VIA U.S. MAIL AND EMAIL

Re:    Copyright infringement and Breach of Contract

Dear Mr. Katzenbach:

My client, Gail Bleckman, is the owner of copyright in video footage taken by her (the "Works") while she was working as an independent producer on your project about the Amityville murders ("Amityville Project"). As explained below, you never obtained an assignment of our clients copyrighted material, which you used in at least three films and one special aired on REELZ, which gives rise to both a copyright claim against you, and a copyright claim against all of the distributors of your films including REELZ and Amazon.

You are also in breach of an agreement between you and Ms. Bleckman to pay her 5% of all gross receipts derived from the Amityville Project ("Oral Agreement"), which includes but is not limited to, gross receipts from exploitation of the following films:  "Shattered Hopes: The True Story of the Amityville Murders - Part 1: From Horror to Homicide"; "Shattered Hopes: The True Story of the Amityville Murders - Part 2: Mob, Mayhem, Murder"; "Shattered Hopes: The True Story of the Amityville Murders - Part 3: Fraud & Forensics" ("Films"), a special aired on television through the REELZ network titled "High Hopes: The Amityville Horror Murders" ("REELZ Special") and a DVD interview with convicted killer Ronald DeFeo Jr. ("DeFeo Interview").

Finally, you have misappropriated Ms. Bleckman's ideas and proprietary research and breached an implied-in-fact contract to pay Ms. Bleckman for the use of those ideas and proprietary research in connection with the Amityville Project and all subsequent properties developed therewith.

### Infringement of Ms. Bleckman's Copyrights

The Copyright Act of 1976 provides that copyright ownership "vests initially in the author or authors of the work." 17 U. S. C. § 201(a). As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection. § 102; *Cmty. for Creative Non-Violence v. Reid,* 490 U.S. 730, 737 (1989).

As you assert in your October 27, 2010 Authorization Letter (Exhibit "A"), Ms. Bleckman was an independent agent at the time that she worked on the Amityville Project. As an independent contractor, all copyrights in footage, photographs, and other protectable materials created by Ms. Bleckman, vested in Ms. Bleckman and cannot be exploited without express written permission. See *Garcia v Google, Inc*., 743 F3d 1258 (2014); See also *Gaiman v McFarlane*, 360 F.3d 644 (2004).

1

Furthermore, you never obtained a written assignment of rights in any of Ms. Bleckman's protected Works, and copyrights must be transferred by written assignment. The Copyright act states that "[a] transfer of copyright ownership, other than by operation of law, *is not valid* unless an instrument of conveyance, or a note or memorandum of the transfer, *is in writing and signed by the owner of the rights* conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a) (emphasis added).

As the copyright owner of all of these Works, my client has several exclusive rights under The Copyright Act 1976. These exclusive rights include the right to reproduce the Works (17 U.S.C. § 106(1)), and to publish and distribute the Works to the public, including by way of sale (17 U.S.C. §§ 106(3)). It is an infringement of copyright to do any of the acts comprised in the copyright in relation to the whole or a substantial part of the Works, or to authorize such an act, without the permission or license of the copyright owner. In other words, use without a valid license, as is the case here, is considered copyright infringement in violation of U.S. Copyright Law.

On at least two occasions, Ms. Bleckman emailed you and specifically asked that you either omit or reshoot footage to which she owned rights, and that you cease and desist from using the footage. (Exhibits "G" and "K") That footage later appeared as part of the REELZ Special. Specifically, the scene appears at approximately 1:41:13 in the REELZ Special, and depicts my client pointing at blood flakes on clothes and shell casings.

As you have failed to seek permission or a license from the owner of copyright in these Works to use them in your Films and other properties, the conduct described above constitutes infringement of my client's copyright.

### Breach of the Oral Agreement

The breach of contract claims are straight forward, as set forth in the complaint attached.

As to the Oral Agreement, it is clear through numerous emails and other correspondence between you and Ms. Bleckman that you agreed to pay her 5% of all gross receipts. (See Exhibits "H", "J" and "K"). To date, Ms. Bleckman has yet to receive any payments despite the full performance of her obligations to provide her proprietary research to you.

Additionally, Ms. Bleckman reached out to you regarding payment in connection with the airing of the REELZ Special, and you advised her to sign the proposed long form contract you sent to her on or around October 12, 2012 ("Proposed Contract") before payment could be remitted. (Exhibit "H"). In an effort to enter into a good faith negotiation with you, Ms. Bleckman hired an attorney (Phil Wild) who sent to you a list of revisions to the Proposed Contract. (Exhibit "I") You responded by rebuffing her attempts to negotiate (Exhibit "J").

### Breach of Implied in Fact Contract

The claims for breach of implied contract are equally straight forward under California law because the law implies an obligation to pay for the use of our client's ideas and research.

"Where an idea has been conveyed with the expectation of the purveyor that compensation will be paid the idea is used, there is no reason why the producer who has been the beneficiary of the conveyance of such an idea, and who finds it valuable and is profiting by it, may not the for the first time, although he has no obligation to do so, promise to pay a reasonable compensation for that idea – that is, for the past services of furnishing it to him – and thus create a valid obligation. *Blaustein v. Burton*, 9 Cal.App.3d 161, 182 (1970).

2

As you have stated in numerous correspondence with Ms. Bleckman as well as articles found through your project's website, Ms. Bleckman's research that she disclosed to you with the expectation of payment, led to the development of key story lines in the Amityville Project. (Exhibit "B", "C" and "D").

First, there need not be an express agreement for an implied-in-fact contract to be formed. *Gunther-Wahl Productions v. Mattel* 104 Cal.App.4[th] 27 (2002). All that is required is that you knew or should have known from the circumstances that Ms. Bleckman had an expectation of payment for the use of her ideas. *Id.*

Second, the obligation to compensate Ms. Bleckman arises out of the circumstances under which her research and ideas were disclosed: the question is whether there is an implied understanding that the disclosure of ideas is for mutual business purposes. *Thompson v. California Brewing Co.* 191 Cal.App.2d 506, 510 (1968)

Moreover, a disclosure made for the purpose of partnering on entertainment projects is sufficient consideration. *Montz v. Pilgrim Films*, 649 F.3d 975, 977 (9th Cir. 2011). The consideration for the obligation to compensate is the disclosure.

Any missing "deal points" are implied by what is reasonable and what is consistent with custom and practice in the industry (e.g. that Ms. Bleckman be an executive producer on the project for having provided the information that led to its creation). *Gunther-Whal Productions*, supra, 63-65.

In addition to you, Diana Maiocco, and Amityville Holdings, LLC are liable as co-obligors (*Keppelman v. Heikes,* 111 Cal. APP.2d 475, 481 (1952) (" Where all the parties who unite in a promise receive some benefit from the consideration, whether past or present, their promise is presumed to be joint and several."); *Favila v. Katten Muchin Rosenman LLP*, 188 Cal.App.4th 189, 206 (2010) ("it is the settled rules that 'to render a person civilly liable for inures resulting from a conspiracy of which he is a member, it is not necessary that he should have joined the conspiracy at the time of its inception; everyone who enters into such a common design is in law a party to every act previously or subsequently done by any of the others in pursuance or it." *Id.*)

**Conclusion**

My client desires to resolve this matter amicably and assumes the same from you. Again, at no point in time did my client authorize your use of the Works listed above. If previous licensing or permission has been given to you for the use of any of the Work, we request that you provide proof of such authorization. Otherwise you will be subject to the following:

According to U.S. Copyright Law, my client is entitled to seek an award of statutory damages for all infringements in involved this matter, in a sum up to $30,000 for each infringement. (17 U.S.C. § 504(c)(1).) If a court finds that the infringement was committed willfully, my client is entitled to seek an award of $150,000 for each infringement. (17 U.S.C. § 504(c)(2).)

To rectify this infringement of the aforementioned rights, we require that you:

1.       Immediately cease and desist infringing my client's copyrights, including, but not limited to, discontinuing any and all publication, exhibition, or dissemination of

Films, REELZ Special, and DeFeo Interview containing the infringing Works and destroying any such copies of said properties; and

2.  Provide my client with $150,000 per airing of the REELZ special for a total of no less than $1.5 million for the use of her Works to date.

State courts in California and New York have returned verdicts for copyright infringement ranging from $100,000 to $125 Million. Our client has a very strong case that you intentionally infringed her rights in her copyrighted footage without her permission, and we believe that a jury will find in for her in the higher range of the verdicts.

Furthermore, my client demands an accounting of all revenues derived from properties created in connection with the Amityville Project including but not limited to the Films listed above, the REELZ Special and the DeFeo Interview and any other works that have utilized my client's copyrighted footage and proprietary research. In addition to an accounting, My client demands that your immediately forward payment of her 5% of the gross receipts of for her work on the Amityville Project, including but not limited to 5% of gross receipts from all distribution, both domestic and foreign, and all merchandising.

You are now on notice as to my client's copyright in respect of the Works described above. If I do not receive an adequate response within 15 days of this letter, I will take any and all such action on behalf of my client in order to protect her rights including, without limitation, legal action for injunctive relief and to recover damages, together with accrued interest and costs. My client otherwise reserves all her rights under the law. If we are unable to reach speedy a resolution to this matter, my client reserves the right to pursue any and all legal claims against you, Diana Maiocco, Amityville Holdings, LLC, the REELZ network and any other relevant parties including but not limited to Amazon and any and all foreign distributors.

Please also be advised that you are under a legal duty to maintain, preserve, retain, protect, and not destroy any and all documents and data, both electronic and hard copy, that may be relevant to Bleckman's claims as set forth in the attached complaint. The failure to preserve and retain the electronic data and evidence outlined in this notice may constitute spoliation of evidence which will subject you to legal claims for damages and/or evidentiary and monetary sanctions.

I look forward to hearing from you and promptly resolving this matter.

Very Truly Yours,

S. Michael Kernan
[Enclosures]

4

S. Michael Kernan, State Bar No.181747
R. Paul Katrinak, State Bar No. 164057
THE KERNAN LAW FIRM
9663 Santa Monica Blvd Suite 450
Beverly Hills, California 90210
Telephone: (310) 490-9777
Facsimile: (310) 861-0503

Attorneys for Plaintiff
GAIL BLECKMAN

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

GAIL BLECKMAN, an individual;

Plaintiff,

vs.

RYAN KATZENBACH, an individual
dba KATCO MEDIA; DIANA
MAIOCCO, an individual;
AMITYVILLE HOLDINGS, INC., a
California Corporation; HUBBARD
BROADCASTING, INC. aka
REELZCHANNEL aka REELZ, a
Minnesota corporation and DOES 1
through 50, inclusive,

Defendants.

Case No.:

**COMPLAINT FOR DAMAGES AND
INJUNCTION FOR:**

**1. COPYRIGHT INFRINGEMENT
2. BREACH OF IMPLED-IN-FACT
CONTRACT
3. BREACH OF ORAL CONTRACT
4. DECLARATION OF RIGHTS
5. QUANTUM MERUIT**

**DEMAND FOR JURY TRIAL**

PLAINTIFF in the above-captioned action hereby alleges as follows:

1.      At all times mentioned herein, Plaintiff GAIL BLECKMAN
("Bleckman") is an individual residing in Los Angeles, California. Bleckman
was, at all relevant times, an independent producer and researcher on a film
project about the true story of the infamous Amityville murders committed by
Ronald DeFeo Jr. in 1974 ("Amityville Project").

1

**COMPLAINT FOR DAMAGES**

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

## JURISDICTION AND VENUE

2.     This action arises under the Copyright Laws of the United States (Title 17, U.S.C. §101 et seq.) and the common law of the State of California.

3.     This court has exclusive jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338 in that this action involves claims arising under the Copyright Laws of the United States. To the extent that this action is based on related state claims, the Court has supplemental jurisdiction thereto under 28 U.S.C. § 1367.

4.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400 in that Defendants transact business in the county of Los Angeles, State of California.

## PARTIES

5.     Upon information and belief, at all times mentioned herein, Defendant RYAN KATZENBACH ("Katzenbach") dba KATCO MEDIA ("Katco") is an individual doing business in Los Angeles, California and is co-owner of the Amityville Project. Upon information and belief, Katco has a business address at 6404 Wilshire Blvd., Suite 1800, Los Angeles, California, 90048.

6.     Upon information and belief, at all times mentioned herein, Defendant AMITYVILLE HOLDINGS, INC ("Amityville Holdings") is a California corporation doing business in Santa Ana, California. Upon information and belief, Amityville Holdings has a business address at 6 Hutton Center Drive, 6th Floor, Santa Ana, California, 92707.

7.     Upon information and belief, at all times mentioned herein, Defendant DIANA MAIOCCO ("Maiocco") is an individual doing business in Los Angeles, California. On information and belief, Maiocco is Vice President and Chief Operating Officer of Defendant Amityville Holdings, and co-owner of the Amityville Project with Defendant Katzenbach.

**COMPLAINT FOR DAMAGES**

8.      Upon information and belief, at all times mentioned herein, Defendant HUBBARD BROADCASTING, INC. aka REELZCHANNEL aka REELZ ("REELZ") is a Minnesota corporation doing business in Los Angeles, California. On information and belief, Hubbard's Corporate Headquarters are located at 3415 University Avenue, St. Paul, MN 55114. On information and belief, REELZ has a business address at 1201 W. 5th Street, Los Angeles, CA 90017.

9.      Plaintiff is unaware of the true names and capacities of the Defendants sued herein as DOES 1 through 50, inclusive, and for that reason, sues such Defendants under such fictitious names. Plaintiff is informed and believes and on that basis alleges that such fictitiously named Defendants are responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages as herein alleged were proximately caused by the conduct of said Defendants. Plaintiff will seek to amend the complaint when the names and capacities of such fictitiously named Defendants are ascertained. As alleged herein, "Defendants" shall mean all named Defendants and all fictitiously named Defendants.

10.     Plaintiff is informed and believes and on that basis alleges that Defendants, at all times relative to this action, were the agents, servants, partners, joint venturers and employees of each of the other Defendants and in doing the acts alleged herein were acting with the knowledge and consent of each of the other Defendants in this action. Alternatively, at all times mentioned herein, each of the Defendants conspired with each other to commit the wrongful acts complained of herein. Although not all of the Defendants committed all of the acts of the conspiracy or were members of the conspiracy at all times during its existence, each Defendant knowingly performed one or more acts in direct furtherance of the objectives of the conspiracy. Therefore, each Defendant is liable for the acts of all of the other conspirators.

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

3

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

## BACKGROUND FACTS

11.   Around 2010, Plaintiff Bleckman became acquainted with Defendant Maiocco while making a documentary about cancer patients. Defendant Maiocco offered to introduce Bleckman to friend Defendant Katzenbach, who was in the early stages developing a film about the true story of the infamous Amityville murders committed by Ronald DeFeo Jr. in 1974 ("Amityville Project") with Defendant Maiocco. The Amityville Project would lead to development of at least three films: "Shattered Hopes: The True Story of the Amityville Murders - Part 1: From Horror to Homicide"; "Shattered Hopes: The True Story of the Amityville Murders - Part 2: Mob, Mayhem, Murder"; "Shattered Hopes: The True Story of the Amityville Murders - Part 3: Fraud & Forensics" ("Films"), a special aired on television by Defendant REELZ titled "High Hopes: The Amityville Horror Murders" ("REELZ Special") and a DVD interview with convicted killer Ronald DeFeo Jr. ("DeFeo Interview").

12.   On information and belief, Defendants Katzenbach and Maiocco are co-owners of the Amityville Project.

13.   On information and belief, on or about the summer of 2010, Defendants Katzenbach and Maiocco decided to move forward with production of the Amityville Project through Defendant Katzenbach's production entity Katco.

14.   At that time, Bleckman was preparing to permanently move from her native New York to Los Angeles, California. On or about May or June of 2010, Defendant Katzenbach asked Bleckman if she would perform research for the Amityville Project in New York during the month she would be preparing to move from New York.

### The Oral Agreement

15.   On information and belief, in a conversation between Bleckman and Defendant Katzenbach, Defendant Katzenbach explained that he could not pay

**COMPLAINT FOR DAMAGES**

1   Bleckman for her work and instead offered to give her a percentage of any gross
2   receipts derived from the Amityville Project in exchange for her work on the
3   Amityville Project. On information and belief, Bleckman and Defendant
4   Katzenbach orally agreed that Bleckman was to receive 5% of any gross receipts
5   from the Amityville Project, and as consideration Bleckman would conduct
6   research and perform other work for the Amityville Project as an independent
7   producer and at her own expense ("Agreement").

8       16.    During this time, Defendant Katzenbach held out his production
9   entity Katco, as a Screen Actor's Guild Signatory Production Company.
10  Bleckman understood this to mean that Katco had signed, and agreed to abide by,
11  the labor agreement negotiated by the Screen Actors Guild-American Federation
12  of Television and Radio Artists union (SAG-AFTRA).

13      17.    On information and belief, Katco is a signatory of the SAG-AFTRA
14  labor agreement. This allowed Katco to utilize SAG-AFTRA members in its
15  production of the Amityville Project. In fact, the REELZ special was narrated by
16  actor Ed Asner, former president of the Screen Actors Guild.

17      18.    Bleckman relied on Defendant Katzenbach's representation that any
18  production from the Amytiville Project created through Katco would be fully
19  compliant with the SAG-AFTRA labor agreement.

20                          **Bleckman's Protected Works**

21      19.    On or about August 2010, Bleckman began doing research for the
22  Amityville Project in accordance with her Agreement with Defendant
23  Katzenbach. Bleckman's work consisted of obtaining documents, crime scene
24  photos, and other information through her personal connections with the Suffolk
25  County police in New York State, as well as personally shooting video footage
26  for the Amityville Project. In addition, Bleckman also helped produced some
27  segments that appeared in the Films

28

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

**COMPLAINT FOR DAMAGES**

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

20.  At all relevant times, Bleckman worked as an independent contractor on the Amityville Project. In a letter of authorization, Defendant Katzenbach stated that Bleckman was "an independent agent and producer who represents our project in an unofficial capacity and on a commission status." (Exhibit "A"). Thus, as an independent contractor, all copyrights in proprietary footage and photographs and other protectable works created by Bleckman vested in Bleckman.

21.  At no time did Bleckman and Defendant Katzenback discuss assignment of Bleckman's rights in her proprietary footage, and at no time did Bleckman ever execute any written assignment of her rights to her proprietary footage to any person or entity.

22.  Through her efforts, Bleckman was able to obtain considerable information that had never been made public, including crime scene photos, unredacted reports, and files previously thought to be lost or destroyed. For example, Bleckman's proprietary research uncovered evidence that more than one weapon had been used to commit the murders, and that the second weapon had likely been discarded in a canal near the house where the murders were committed. This theory would be a central storyline in the Films and the REELZ Special. (Exhibit "B"). Other storylines involving the disputed existence of a seventh body at the crime scene and a mysterious picture of a bloody shoe were developed from Bleckman's proprietary research and featured prominently in the Films and the REELZ Special. (Exhibits "C" and "D").

23.  In addition to her proprietary research, Bleckman created video footage depicting her explaining the significance of a blood pattern on a piece of clothing and describing spent gun shell casings.

24.  Bleckman disclosed her proprietary research and ideas for the Amityville Project to Defendant's Katzenbach and Maiocco relying on the

**COMPLAINT FOR DAMAGES**

1  Agreement, and with the expectation that she would be paid if any of her ideas or
2  proprietary research were to be used as part of the Amityville Project.

**Bleckman's Reasonable Reliance On The Agreement**

3
4  25.   Bleckman spent the next seven months working on the Amityville
5  Project. During this time, Defendant Katzenbach did not reimburse her for any
6  travel or lodging expenses. On information and belief, while working on the
7  Amityville Project, Bleckman spent an estimated $12,000-$15,000 of her own
8  money, relying on her Agreement with Defendant Katzenbach.

9  26.   Bleckman also used her considerable contacts in the entertainment
10 industry to further the Amityville Project. On or about October, 2010, Defendant
11 Katzenbach asked Bleckman to spearhead obtaining distribution for the
12 Amityville Project. Defendant Katzenbach drafted a letter of authorization on
13 Katco letterhead dated October 27, 2010, authorizing Bleckman to discuss the
14 Amityville Project with distributors. (Exhibit "A" ). The letter states that
15 Bleckman is "an independent agent and producer of the project" and that she is
16 being paid "on a commission status."

17 27.   Throughout 2010, 2011, and 2012, Bleckman continued to do
18 research for the Amityville Project at her own expense.

**Defendant's Katzenbach and Maiocco Cease Contact With Bleckman**

19
20 28.   On information and belief, in December of 2011, Katco transferred
21 all of its rights in the Amityville Project to the entity Amityville Holdings.
22 (Exhibit "E").

23 29.   On or about January 2012, Bleckman and Defendant Maiocco had a
24 falling out, and Bleckman sent an email to Defendant Katzenbach explaining the
25 situation and her desire to continue working on the project.

26 30.   On or about May 23, 2012, Bleckman emailed Defendant
27 Katzenbach stating that she had repeatedly asked for a formal written document
28 confirming the Agreement, and stating that because of Defendant Katzenbach's

THE KERNAN LAW FIRM
9665 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

1  delays and unwillingness to provide an accounting, Bleckman had missed the
2  deadline to file her taxes. In the email Bleckman told Defendant Katzenbach to
3  either "ditch the existing footage" of Bleckman explaining the significance of
4  pieces of evidence that she created, or "re-shoot it." (Exhibit "G").

5       31.    In an email dated October 15, 2012 Defendant Katzenbach
6  acknowledged that he and Bleckman had a "verbal 5% arrangement." (Exhibit
7  "K").

8       32.    Bleckman sent a response email on October 16, 2012 stating that
9  Defendant Katzenbach had still refused to submit a written document confirming
10 the Agreement and stating that Defendant Katzenbach was to "cease and desist
11 from using any footage of me," a reference to footage Bleckman shot of her
12 describing bloody clothing and shell casings. (Exhibit "K").

13      33.    On or about October 17, 2012, Defendant Katzenbach emailed
14 Bleckman a written proposal for Bleckman to execute, which included a
15 proposed assignment of Bleckman's rights in her copyrighted footage and
16 photographs ("Proposed Contract"). Katzenbach sent the Proposed Contract on
17 Katco letterhead (Exhibit "F").

18      34.    Bleckman was aware that in December of 2011, Katco transferred
19 all of its rights in the Amityville Project to the entity Amityville Holdings
20 (Exhibit "E"). Bleckman did not execute the document.

21      35.    In 2013, Defendants Katzenbach and Maiocco ceased all contact
22 with Bleckman regarding the development and distribution of the Amityville
23 Project.

24                    **Defendants' Infringement**

25      36.    In late 2014, Bleckman received a phone call from a friend
26 congratulating her on the airing of the REELZ Special on Defendant REELZ's
27 television network. Up until the phone call, Bleckman had no knowledge that the

28

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

1  Amityville Project had continued, let alone that a full length film had been

2  produced and sold to Defendant REELZ.

3       37.    On information and belief, on or about October 29, 2014, Defendant

4  REELZ aired the REELZ Special. Bleckman was able to view a portion the

5  REELZ Special, and discovered that the proprietary footage she shot had been

6  included in the REELZ Special, including the scene that depicted Bleckman

7  explaining the significance of a blood pattern on a piece of clothing and

8  describing spent gun shell casings. Bleckman had no knowledge that her

9  proprietary footage would be used in the REELZ Special, nor did she give

10 permission to Defendants Katzenbach, Maiocco or REELZ to use the footage,

11 nor was she compensated for use of that footage.

12      38.    Bleckman later discovered that in addition to the REELZ Special,

13 the Films and DeFeo Interview had also been produced by Defendants

14 Katzenbach and Maiocco, all of which utilized the copyrighted materials,

15 proprietary research and ideas derived from Bleckman's work on the Amityville

16 Project.

17      39.    On or about March or April of 2015, Bleckman contacted Defendant

18 REELZ identifying herself as a producer on the Amityville Project and asking for

19 Defendant Katzenbach's contact information so that she could get in touch with

20 him regarding payment of her royalties for the REELZ Special. On or about July,

21 8, 2015, Defendant Katzenbach sent an email to Bleckman and a REELZ

22 Executive acknowledging that he and Bleckman had agreed to a royalty payment

23 and stating that he would not issue a check or royalty statement until the October

24 2012 Proposed Contract was signed and delivered. (Exhibit "H").

25      40.    On information and belief, Defendant REELZ is a signatory to the

26 SAG-AFTRA labor agreement, meaning that Defendant REELZ has agreed only

27 to exploit films that are compliant with the SAG-AFTRA labor agreement.

28

41.     On information and belief, Part 3 of the Films, and the REELZ Special are not registered through SAG-AFTRA and are not in compliance with the SAG-AFTRA labor agreement and are not registered with SAG-AFTRA.

42.     At no time did Bleckman assign any of her rights in her protected works for exploitation in any of the Films or in the REELZ Special.

43.     Bleckman relied on Defendant Katzenbach's representation that all Katco productions would comply with the SAG-AFTRA labor agreement, and at no time did she give Defendant Katzenbach nor Defendant REELZ permission to exploit her protected works on the REELZ Special, which, on information and belief, is not in compliance with the SAG-AFTRA labor agreement.

**Defendant Katzenbach Refuses To Negotiate In Good Faith**

44.     On or about 2015, Bleckman contacted attorney Phil Wild ("Attorney Wild") who advised Bleckman not to sign the Proposed Contract. Bleckman retained Attorney Wild to negotiate the terms of the Proposed Contract with Defendant Katzenbach. Attorney Wilde sent Defendant Katzenbach a redlined document with revisions to the Proposed Contract. (Exhibits "I").

45.     In an email to Attorney Wild dated September 1, 2015, Defendant Katzenbach rejected the revisions and promised to send a follow up email detailing his position regarding the disputed points. (Exhibit "J"). Attorney Wild sent a follow up email asking for Defendant Katzenbach's response no later than September 11, 2015. (Exhibit "J").

46.     On information and belief, Defendant Katzenbach never responded to Attorney Wild's email. On information and belief, Defendant Katzenbach sent an email directly to Bleckman accusing her of acting in bad faith and breaching her fiduciary duties.

47.     Since that time, Bleckman has unsuccessfully tried to obtain her 5% royalty that she and Defendant Katzenbach agreed to for her work on the Amityville Project.

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

10

55.    As alleged hereinabove, the named Defendants have infringed upon Plaintiff Bleckman's copyright by using Plaintiff Bleckman's footage without her permission.

56.    Upon information and belief, Defendants have thereafter intentionally broadcasted, distributed, published, and otherwise exploited Plaintiff's footage without authorization, in violation of Plaintiff Bleckman's rights.

57.    Upon information and belief, Defendants have intentionally violated the Federal Copyright Act, Title 17 U.S.C. § 101 et seq., entitling Plaintiff to all damages and remedies provided by the Act.

58.    Upon information and belief, Defendants continue to infringe upon Plaintiff Bleckman's copyrights, causing Plaintiff Bleckman irreparable injury and damage. Said infringement entitles Plaintiff Bleckman to actual and statutory damages, injunctive and other relief provided by the Copyright Act.

## SECOND CAUSE OF ACTION

### (Breach of Implied-In-Fact Contract – Against Defendants Katzenbach, Maiocco, Amityville Holdings and DOES 1-25)

59.    Plaintiff incorporates paragraphs 1 to 58 as though fully set forth herein.

60.    Defendants' Films, the REELZ Special, and the Defeo Interview utilized Plaintiff Bleckman's key ideas and proprietary research, and are currently distributed through Amazon Prime, Defendants' Website (AmityvilleFilm.com), and periodically broadcasted by Defendant REELZ.

61.    Plaintiff Bleckman disclosed her ideas and/or proprietary research to Defendants with the understanding that she would be compensated if her ideas and proprietary research were used by them.

62.    By virtue of Defendants' acceptance and utilization of the services, ideas, and proprietary research of Plaintiff Bleckman, an agreement was implied-

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

**COMPLAINT FOR DAMAGES**

(a)     Defendants took Plaintiff Bleckman's ideas and proprietary research and developed a series of properties without any compensation or credit to Plaintiff Bleckman;

(b)     Defendants took sole credit for creation of all properties developed from the Amityville Project without the agreed upon credit to Plaintiff Bleckman.

70.     Plaintiff Bleckman has been damaged by said breaches in an amount to be proved at trial.

## FOURTH CAUSE OF ACTION

### (Declaratory Relief – Against All Defendants)

71.     Plaintiff incorporates paragraphs 1 to 70 as though fully set forth herein.

72.     An actual dispute and controversy now exists between the Defendants and Plaintiff Bleckman as to whether Plaintiff Bleckman should be entitled to compensation, and credit in connection with the Films, REELZ Special, and the Defeo Interview developed from Plaintiff Bleckman's ideas, proprietary research, and copyrighted materials on the Amityville Project.

73.     Plaintiff Bleckman believes that she is entitled to compensation and credit in connection with the properties developed from the Amityville Project.

74.     Plaintiff Bleckman is informed and believes and on that basis alleges that Defendants dispute Plaintiff Bleckman's contentions. Plaintiff therefore desires and requests a judicial determination and declaration of the respective rights and obligations of the parties.

## FIFTH CAUSE OF ACTION

### (*Quantum Meruit* – Against All Defendants)

75.     Plaintiff incorporates paragraphs 1 to 75 as though fully set forth herein.

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

14
**COMPLAINT FOR DAMAGES**

76.     In preparing and developing her ideas, proprietary research, and copyrighted materials, Plaintiff Bleckman has rendered significant services to Defendants.

77.     Those services were of a direct and substantial benefit to Defendants.

78.     Therefore, there is an agreement implied-in-law and in-fact to pay Plaintiff Bleckman the reasonable value of her services.

79.     Consistent with custom and practice in the entertainment industry, Plaintiff Bleckman should be paid the reasonable value of Plaintiff Bleckman's services at an amount to be determined at trial.

**WHEREFORE, PLAINTIFF prays:**

**ON THE FIRST CAUSE OF ACTION**

1.     For damages in an amount according to proof in an amount to be proved at trial.

**ON THE SECOND CAUSE OF ACTION:**

2.     For damages in an amount according to proof in an amount to be proved at trial.

**ON THE THIRD CAUSE OF ACTION:**

3.     For damages in an amount according to proof in an amount to be proved at trial.

**ON THE FOURTH CAUSE OF ACTION:**

4.     For a declaration of rights and obligations.

**ON THE FIFTH CAUSE OF ACTION:**

5.     For the reasonable value of services rendered.

**ON ALL CAUSES OF ACTION:**

6.     For costs of suit incurred herein;

7.     For attorneys' fees;

8.     For such other and further relief as is just and proper.

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

**COMPLAINT FOR DAMAGES**

1
2   DATED: September 1, 2016                          THE KERNAN LAW FIRM
3
4                                             By:_____
5                                                   S. Michael Kernan
                                                     Attorney for Plaintiff
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THE KERNAN LAW FIRM
9663 Santa Monica Blvd., Suite 450
Beverly Hills, California 90210
(310) 490-9777

**COMPLAINT FOR DAMAGES**

# EXHIBIT "O"
Complaint For Declaratory Relief
Katzenbach v. Bleckman



| Help | Search | History | Titles | Start Over |

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Bleckman, Gail
Search Results: Displaying 1 through 7 of 7 entries.


◁ previous    next ▷

Resort results by:                                                    Set Search Limits

| # | Name (NALL) < | Full Title | Copyright Number | Date |
|---|---|---|---|---|
| [ 1 ] | Bleckman, Gail | Stand-Up America. | PAu003354276 | 2008 |
| [ 2 ] | Bleckman, Gail Tracy | American Gunslinger. | PAu003802991 | 2016 |
| [ 3 ] | Bleckman, Gail Tracy | Cancer, And My Name Is | PAu003434709 | 2010 |
| [ 4 ] | Bleckman, Gail Tracy | Trending with Katie. | PAu003751092 | 2014 |
| [ 5 ] | Bleckman, Gail Tracy, 1965- | Nannie. | PAu003687303 | 2013 |
| [ 6 ] | Bleckman, Gail Tracy, 1965- | Slapsie Maxie. | PAu003579329 | 2011 |
| [ 7 ] | Bleckman, Gail Tracy, 1965- | Tailgatin'. | PAu003392273 | 2009 |

Resort results by:                                                    Set Search Limits

Clear Selected    Retain Selected

◁ previous    next ▷

| Save, Print and Email (Help Page) | | |
|---|---|---|
| **Records** | Select Format:   Full Record     Format for Print/Save | |
| All on Page | Enter your email address: | Email |
| Selected On Page | | |
| Selected all Pages | | |

Search for: Bleckman, Gail       Search by: Name (Crichton Michael; Walt Disney Company)       Item type:  None

25 records per page                                    Submit    Reset

Help   Search   History   **Titles**   Start Over

Contact Us  |  Request Copies  |  Get a Search Estimate  |  Frequently Asked Questions (FAQs) about Copyright  |  Copyright Office Home Page  |  Library of Congress Home Page

# EXHIBIT "P"

Complaint For Declaratory Relief
Katzenbach v. Bleckman



# EXHIBIT "Q"
Complaint For Declaratory Relief
Katzenbach v. Bleckman

# EXHIBIT "R"
Complaint For Declaratory Relief
Katzenbach v. Bleckman

**Subject:** Re: Contract

**From:** Ryan Katzenbach (katadvertising@yahoo.com)

**To:** Gbleckman@aol.com;

**Date:** Wednesday, October 17, 2012 11:20 AM


And furthermore, please send me the name, address and phone number of your attorney so that I can speak to him.

-Ryan

*She Never replied*

---------------------------------------------------------------------------------------------------------
------------

## Katco Media      Amityville Holdings, Inc.

A SCREEN ACTOR'S GUILD SIGNATORY PRODUCTION COMPANY    A CALIFORNIA CORPORATION
6404 Wilshire Boulevard, Suite 1800        6404 Wilshire Boulevard, Suite 1805
Los Angeles, California 90048 • United States of America    Los Angeles, California 90048 • United States of America
ryan@amityvillefilm.com • info@amityvillefilm.com
www.shattereddocumentary.com

**NOTHING IN THIS MESSAGE IS INTENDED TO CONSTITUTE AN ELECTRONIC SIGNATURE UNLESS A SPECIFIC STATEMENT TO THE CONTRARY IS INCLUDED IN THIS MESSAGE.**

**CONFIDENTIALITY NOTICE:** *This message is intended only for the person or entity to which it is addressed. It may contain confidential and/or privileged material. Any review, transmission, dissemination or other use, or taking of any action in reliance upon this message by persons or entities other than the intended recipient is prohibited and may be unlawful. If you received this message in error, please contact the sender and delete it from your computer.*

**From:** "Gbleckman@aol.com" <Gbleckman@aol.com>
**To:** "katadvertising@yahoo.com" <katadvertising@yahoo.com>
**Sent:** Wednesday, October 17, 2012 10:07 AM
**Subject:** Re: Contract

Ryan, you have asked this of me before, in which I gave you my address.
If you have a contract (and I say IF because now, I don't believe you ever had one drawn up at all) then email it to me. For this you do not need my address. Also, do not forget a copy of the financial statements, which include number of units sold along with every means of distribution.
If this is not emailed to me today, my attorney (with whom I am sitting in front of right now) will be handling this from here on in.
Gail.

Sent from my HTC smartphone on the Now Network from Sprint!


----- Reply message -----
**From:** "katadvertising@yahoo.com" <katadvertising@yahoo.com>
**To:** <GBleckman@aol.com>
**Subject:** Contract
**Date:** Wed, Oct 17, 2012 1:06 am

**Subject:**   Re: Fw: Contract

**From:**   Ryan Katzenbach (katadvertising@yahoo.com)

**To:**   GBleckman@aol.com;

**Cc:**   rick@bslaw.net;

**Date:**   Tuesday, October 16, 2012 8:13 PM


GB:

I said contract tonight or Wed - you said contract by tonight or Wed morning in agreement.  I thought this was agreed upon and hence my project when I get home tonight so I can send to you tomorrow.  There is no stall tactic on my part so just cut the shit.  I told you I wouldn't get back to this issue until Tuesday sometime.  Well, newsflash, it's still Tuesday.

In the meantime, you can exercise all the legal options you want.  Simple fact:  if you release the documentation that Diana and I paid for, and have proof of such payment, as part of the research on our film OR you compromise the ending of this film series in any way by revealing research for which you were privy, we will be going to court and I will be the Plaintiff.  As far as I am concerned, you have indicated a willingness to breach a standing verbal agreement and understanding.  I really hope this is not the case.  As I said, your contract is coming tomorrow.

-RK

cc:  Rick Walden, Esq.

---------------------------------------------------------------------------------------------------------------------------------
-------------

Katco Media             **Amityville Holdings, Inc.**
A SCREEN ACTOR'S GUILD SIGNATORY PRODUCTION COMPANY     A CALIFORNIA CORPORATION
6404 Wilshire Boulevard, Suite 1800      6404 Wilshire Boulevard, Suite 1805
Los Angeles, California 90048 • United States of America     Los Angeles, California 90048 • United States of America
ryan@amityvillefilm.com • info@amityvillefilm.com
www.shattereddocumentary.com

NOTHING IN THIS MESSAGE IS INTENDED TO CONSTITUTE AN ELECTRONIC SIGNATURE
UNLESS A SPECIFIC STATEMENT TO THE CONTRARY IS INCLUDED IN THIS MESSAGE.

CONFIDENTIALITY NOTICE: This message is intended only for the person or entity to which it is
addressed. It may contain confidential and/or privileged material. Any review, transmission,
dissemination or other use, or taking of any action in reliance upon this message by persons or
entities other than the intended recipient is prohibited and may be unlawful. If you received
this message in error, please contact the sender and delete it from your computer.

---------------------------------------------------------------------------------------------------------------------------------

**From:** "GBleckman@aol.com" <GBleckman@aol.com>
**To:** katadvertising@yahoo.com
**Sent:** Tuesday, October 16, 2012 7:36 PM
**Subject:** Re: Fw: Contract

Ryan... I'm done.

**Subject:**   Re: Fw: Contract

**From:**   GBleckman@aol.com (GBleckman@aol.com)

**To:**   katadvertising@yahoo.com;

**Date:**   Tuesday, October 16, 2012 7:37 PM

*Statute of Limitations*

Ryan... I'm done.

You, once again, have failed to produce a contract on this project. You promised that I would have this tonight or by the morning and what do I get instead? Another bullshit email from you utilizing another stall tactic.

You insist bringing up my relations with others which has 0 to do with my work on this project. You have not paid me one dime, not one dime, for anything.

My work ethic on this project, as it has with all of my others, is a completely separate issue from my friendships or relationships- I know how to separate the two...something that obviously your partner does NOT know how to do. For you to bring this up, yet again, is completely illegal AND unacceptable.

You are to cease and desist from using any footage of me. Period. Furthermore, I am not sitting for an interview and I will be exercising my legal options from here on in.

Gail.


In a message dated 10/15/2012 9:39:27 P.M. Eastern Daylight Time, katadvertising@yahoo.com writes:

Gail:

That is not your property, please understand.  If you threaten me with going somewhere else with the material that Diana and I paid for and have proof of having paid for, I will have no choice but to turn this over to our counsel first thing in the morning.  We have done absolutely nothing to breach a verbal contract that we made; if you do anything to breach that verbal 5% arrangement, I will sue you, Gail.  Fact is, the project i losing money hand over fist at this stage and you are entitled to 5% of ZERO at this juncture.

You talk about all that you have earned and contributed Gail.....there are thousands upon thousands of hours in this on my part.  Not to mention that Diana and I, as of this week, are shelling out thousands upon thousands of dollars to finalize rights acquisition of footage, etc.,. so that we can release Part II  (That's RIGHT, Part II, not Part III - we still have an installment to go) I am not trying to escalate a fight and I am not throwing threats of attorneys here in an effort to incite an argument.  I am asking everyone to please step back and let me get this work done -- contracts, film, etc.,. and yes I know you have been patient, but for Chrissake there has been AN ENORMOUS VOLUME of material to deal with; trying to fight battles with those who have attempted to destroy our project and harm us every step of the way for which I have been forced to rep us in Court and litigate us.

Next, please understand -- the material you found, while holding a terrific amount of details, is and was not the sole crux of our film project.  Important yes but not the be-all-end all.

I have said repeatedly to you that we have every intention of honoring our agreement; we have produced a contract to be delivered to you, and we will carry through with this as promised.  I truly don't think you understand HOW BURIED I am with this project and everything else going on.

PLEASE STOP.  I have enough hell and misery to deal with with this project and I don't need you acting out, too.  But if you're going to threaten attorneys, fine, get yours, I'll get mine.  But it's a huge waste in the end and it's

ridiculous.

STOP IT.

-Ryan

-----------------------------------------------------------------------------------------------------------

**Katco**Media                    **Amityville Holdings, Inc.**
A SCREEN ACTOR'S GUILD SIGNATORY PRODUCTION COMPANY
  A CALIFORNIA CORPORATION
6404 Wilshire Boulevard, Suite 1800 6404 Wilshire Boulevard, Suite 1805
Los Angeles, California 90048 • United States of America Los Angeles, California 90048 • United States of America
ryan@amityvillefilm.com • info@amityvillefilm.com
www.shattereddocumentary.com

**NOTHING IN THIS MESSAGE IS INTENDED TO CONSTITUTE AN ELECTRONIC SIGNATURE UNLESS A SPECIFIC STATEMENT TO THE CONTRARY IS INCLUDED IN THIS MESSAGE.**

*CONFIDENTIALITY NOTICE: This message is intended only for the person or entity to which it is addressed. It may contain confidential and/or privileged material. Any review, transmission, dissemination or other use, or taking of any action in reliance upon this message by persons or entities other than the intended recipient is prohibited and may be unlawful. If you received this message in error, please contact the sender and delete it from your computer.*

----- Forwarded Message -----
**From:** "GBleckman@aol.com" <GBleckman@aol.com>
**To:** katadvertising@yahoo.com
**Sent:** Monday, October 15, 2012 6:20 PM
**Subject:** Re: Contract

Ryan...
You have been saying the very same thing for the better part of 5 months, in addition to telling me that you are coming to Hollywood to film me for this. Well, that never transpired and then you tell me you're coming to NY in Sept- another thing that didn't transpire. And now, you've released part 3- all I can say is that if ANY of those previous tapes of me were utilized, we will have a problem.

I hear nothing from you but a bunch of excuses, stalling what is rightfully mine. If I acted in the same manner that you did, my contributions to this project would have not seen the light of day. You'd be in the same spot with content as you were before  I came into the picture- in fact, the materials that you did get from me are, for all intents and legally binding purposes, my property- you did not pay me for them nor hire me as an "employee", paying me a salary nor cover my expenses while in NY gathering the info. Legally, that deems all of the materials of which I provided as my property. I have legal rights and at this point in the game, I'm prepared to exercise them.

And, while I realize that you are busy with many things that demand your time, I find it very, very hard to believe that in the past 5 months you were unable to find 5 minutes, night or day, to pdf out my contract and supply me with the accompanying financial reports. Basically, I'm tired of constantly being put on your agenda's back burner.

Starting out as a friend of the project, this is, unfortunately not how it is turning out. You and Diana both think that you can ignore me and I'll go away- I assure you, I will not. As someone who has contributed as much as I have to this project, I have been treated COMPLETELY unfair in so many respects, and I'm not putting up with this anymore. I guess Diana's "what, you don't trust us?" statement of last fall should have been a tell-tale sign for me.

I have a meeting on Wednesday with my attorney- he's an entertainment lawyer- about other projects. Please make sure the contract and (verifiable) financial reports are sent to me by Tuesday evening/Wednesday morning. I would like the sum of how many units have been sold, along with the IRS/sales tax statements, Amazon and any other distribution statements. My attorney says I am entitled to this information as a percentage partner, and this is what I want.

I'm really at my rope's end and I think on many levels, you can relate. The only thing that will satisfy and keep me a friend of the project is for you to provide me with the above. If any monies are due to me, I want them too.

Make no mistake- I did not want it to come to this point however yours and Diana's complete exclusion of matters pertaining to me in this project has pushed me to this point.  You've left me out of vital decisions when I am a percentage partner; one who has a vested interest in the outcome of the distribution plus, my bloody name and reputation's attached. You've ignored (and think you know better than I) very crucial avenues which could have been taken. I go out of my way many times over for this project and have had more patience with you who as it turns out, have taken advantage of my patience. You both obviously feel that I have no rights in this property. Well, I do. And now, I'm seriously done playing around.

I really hate to have to write this type of a note, but every time we touch base things are good, you tell me you're going to do something and then I am tossed aside once you hang up the phone. This simply cannot happen any longer.

Best,
Gail.

In a message dated 10/15/2012 7:33:45 P.M. Eastern Daylight Time, katadvertising@yahoo.com writes:

> ....With everything that has been demanding my time and clogging up the pipeline between work and the film, and this stuff leaving my desk, at long last, this afternoon and first thing tomorrow morning (court and film stuff), I should be able to get the home computer fired back up and in commission tomorrow night - so I'll pull the contract off of it and re-email on Wednesday morning.
>
> There are no financials as of yet because the project has not reached the $50K threshold that trips a monthly financial statement and payment to the downstream holders.  We've receipted around $9K at the present moment and there will be another surge with the release of P2.  Because this is an agreement made in EVERY contract executed, we haven't provided an accounting to anyone as of yet.  All of this schedule/payment structure is of course outlined in the contract you'll be receiving Wednesday.
>
> With everything winding down for a brief stint of time, I will be making arrangements for New York sometime in mid November to finish shooting pieces we need for P3 -- so I am getting closer to putting together a specific itinerary to shoot the stuff we need to shoot with you.  It's all inching forward.
>
> -R
> ------------------------------------------------------------------------------------------------------------
> ------------------------

**Amityville Holdings, Inc.**

6404 Wilshire Boulevard, Suite 1800
6404 Wilshire Boulevard, Suite 1805
Los Angeles, California 90048 · United States of America
ryan@amityvillefilm.com · info@amityvillefilm.com
www.shatteraddocumentary.com

ANYTHING IN THIS MESSAGE IS INTENDED TO CONSTITUTE AN ELECTRONIC

**Subject:** Potential date

**From:** Ryan Katzenbach (katadvertising@yahoo.com)

**To:** GBleckman@aol.com;

**Date:** Monday, October 15, 2012 7:17 PM

Gail:

Potential date we're looking at on the calendar is November 30 - Dec. 2-3, potentially.  Trying to get all the players to commit to a shoot, but I'd likely want to see you on Sunday, Dec. 2 for shoot.  Let me know if this date works on your calendar.

-R

-----------------------------------------------------------------------------------------------------------------------------------------

KatCOMedia                          **Amityville Holdings, Inc.**
A SCREEN ACTOR'S GUILD SIGNATORY PRODUCTION COMPANY      A CALIFORNIA CORPORATION
6404 Wilshire Boulevard, Suite 1800           6404 Wilshire Boulevard, Suite 1805
Los Angeles, California 90048 • United States of America    Los Angeles, California 90048 • United States of America
                    ryan@amityvillefilm.com • info@amityvillefilm.com
                         www.shattereddocumentary.com

NOTHING IN THIS MESSAGE IS INTENDED TO CONSTITUTE AN ELECTRONIC SIGNATURE UNLESS A SPECIFIC STATEMENT TO THE CONTRARY IS INCLUDED IN THIS MESSAGE.

CONFIDENTIALITY NOTICE: *This message is intended only for the person or entity to which it is addressed. It may contain confidential and/or privileged material. Any review, transmission, dissemination or other use, or taking of any action in reliance upon this message by persons or entities other than the intended recipient is prohibited and may be unlawful. If you received this message in error, please contact the sender and delete it from your computer.*

# EXHIBIT "S"



Complaint For Declaratory Relief
Katzenbach v. Bleckman

**Subject:**  Re: Where are we at?

**From:**  GBleckman@aol.com (GBleckman@aol.com)

**To:**  katadvertising@yahoo.com;

**Date:**  Wednesday, October 24, 2012 12:40 PM

I need to set aside some time for review, as other more pressing things have taken priority. Will get to it soon.

In a message dated 10/23/2012 8:48:13 P.M. Eastern Daylight Time, katadvertising@yahoo.com writes:

Gail,

Haven't heard from you since delivering the contract.

What are we doing and where are we at?

-R

-------------------------------------------------------------------------------------------------------------------------

**Katco** Media                        **Amityville Holdings, Inc.**
A SCREEN ACTOR'S GUILD SIGNATORY PRODUCTION COMPANY
 A CALIFORNIA CORPORATION
6404 Wilshire Boulevard, Suite 1800 6404 Wilshire Boulevard, Suite 1805
Los Angeles, California 90048 • United States of America Los Angeles, California 90048 • United States of America
ryan@amityvillefilm.com • info@amityvillefilm.com
www.shattereddocumentary.com

NOTHING IN THIS MESSAGE IS INTENDED TO CONSTITUTE AN ELECTRONIC SIGNATURE UNLESS A SPECIFIC STATEMENT TO THE CONTRARY IS INCLUDED IN THIS MESSAGE.

CONFIDENTIALITY NOTICE: This message is intended only for the person or entity to which it is addressed. It may contain confidential and/or privileged material. Any review, transmission, dissemination or other use, or taking of any action in reliance upon this message by persons or entities other than the intended recipient is prohibited and may be unlawful. If you received this message in error, please contact the sender and delete it from your computer.

**Subject:**   Re: Where are we at?

**From:**   Ryan Katzenbach (katadvertising@yahoo.com)

**To:**   GBleckman@aol.com;

**Cc:**   rick@bslaw.net;

**Date:**   Friday, October 26, 2012 11:15 PM


Gail,

I find your last email contemptuous, completely unprofessional and ethically and legally unacceptable.  You have thrown tantrum after tantrum over the written memorialization of a pre-existing verbal agreement.  Now, after your last demands last week, you have been delivered that contract to which you have stated it's, essentially, low priority and you'll look at it when you get a chance.

   You have, in your last communications with me, last week, threatened to take priopretary research materials in your possession, collected while under my employ, paid for by the principals (myself and Diana Maiocco) and you have threatened to look at other "options."  I know you and John Collins (whom served as a videographer on my project, thus giving you access to footage we shot and paid for as part of our documentary) are, at this moment, working with Bill Pfeiffer under the auspices of a new series with a cable network. (And I might remind you that Bill's team and all corresponding research/electronic surveys of the Amityville canal were paid for by US)  I have to believe that this may be the "option" you are working on and are actively trying to circumvent the conclusions of our film through the development of a network series or special that in some way involves Anityville.  I can assure you, Gail, that if this is what you are up to, you will be met with the sharpest legal response you've ever been party to and I can assure you that I will contact any third parties you are working with to reinforce my rights.  Diana and I will sue in any manner necessary to force compliance with the agreement you have made with us,  actively and willfully participated in, to you hold you, and any other third party, accountable for any damages you might inflict or have already inflicted upon us.  If you think I am going to sit back and let you destroy a decade of work, not to mention the investment well over $100,000.00 between Diana and I, then you have seriously underestimated us.

I strongly advise you to declare your true intentions:  are we executing an agreement and going down the road wherein we all receive credit, and ultimately payment, as a result of the project; OR, are we going to Court?  It's just that simple.

Yours,
Ryan Katzenbach

cc:  Rick Walden, Esq.

---------------------------------------------------------------------------------------------------------------------------------
-------------

KatCOMedia                        Amityville **Holdings, Inc.**
A SCREEN AUTHOR'S GUILD SIGNATORY PRODUCTION COMPANY      A CALIFORNIA CORPORATION
6404 Wilshire Boulevard, Suite 1800                6404 Wilshire Boulevard, Suite 1805
Los Angeles, California 90048 · United States of America
    Los Angeles, California 90048 · United States of America
                ryan@amityvillefilm.com · info@amityvillefilm.com
                    www.shattereddocumentary.com

NOTHING IN THIS MESSAGE IS INTENDED TO CONSTITUTE AN ELECTRONIC SIGNATURE
UNLESS A SPECIFIC STATEMENT TO THE CONTRARY IS INCLUDED IN THIS MESSAGE.

CONFIDENTIALITY NOTICE: This message is intended only for the person or entity to which it is
addressed. It may contain confidential and/or privileged material. Any review, transmission,
dissemination or other use, or taking of any action in reliance upon this message by persons or

# EXHIBIT "T"
Complaint For Declaratory Relief
Katzenbach v. Bleckman

**Subject:**   Re: Hi Ryan...

**From:**     GBleckman@aol.com (GBleckman@aol.com)

**To:**         katadvertising@yahoo.com;

**Date:**     Thursday, October 30, 2014 4:05 PM


Hey Ryan...
Yes... we will be in touch.

Best, Gail


Warm Regards
Gail Bleckman
(o) 631. 509. 4397
(c) 631-334-1860

President, Executive Producer
12 Things Productions, LLC.
a New York State Limited Liability Company
GBleckman@aol.com

http://www.imdb.com/name/nm4204317
http://www.linkedin.com/pub/gail-bleckman/10/189/60b


In a message dated 10/30/2014 6:44:39 P.M. Eastern Daylight Time, katadvertising@yahoo.com writes:

> Gail,
>
> Please have your lawyer communicate directly with me.  If necessary, I will have one of our lawyers, either Rick or Harold Levy, communicate back with him/her once I have received the notes.
>
> Thanks,
> Ryan K.
>
>
> On Thursday, October 30, 2014 3:36 PM, "GBleckman@aol.com" <GBleckman@aol.com> wrote:
>
>
> Hey Ryan,
>
> Thank you for your reply. Regarding below, understood and probably the best way to proceed.
>
> My attorney and I reviewed the draft of the contract and realized there are a number of inconsistencies between the deal that we made, and the contract as written. Our deal was

that I would be paid 5% of gross after $50,000 in revenue was received. Plain and simple. That's not what the draft contract stipulates; I wish to fix this and a few other points, as quickly and efficiently as possible.

Should I send our comments to you or your lawyer?

Best, Gail

Warm Regards
Gail Bleckman
(o) 631. 509. 4397
(c) 631-334-1860

President, Executive Producer
12 Things Productions, LLC.
a New York State Limited Liability Company
GBleckman@aol.com

http://www.imdb.com/name/nm4204317
http://www.linkedin.com/pub/gail-bleckman/10/189/60b

In a message dated 10/30/2014 5:08:38 P.M. Eastern Daylight Time, katadvertising@yahoo.com writes:

> Gail,
>
> I sent you a contract that you have not signed. Please sign and return so I can put it in the "executed" folder. Once I have the contract in file, then I can issue you a check for royalties in November as we've now exceeded the $50,000.00 clause.
>
> I prefer that all discussions between you and I take place in written form, via email.
>
> Best,
> Ryan Katzenbach
>
> On Thursday, October 30, 2014 2:01 PM, "GBleckman@aol.com" <GBleckman@aol.com> wrote:
>
> Hi Ryan...
>
> I hope this note finds you well and in good spirits.
>
> I am trying to touch base with you in order to figure out where we are, in terms of the Amityville project, and contract, etc. In doing so, I called the phone number which I had for you, and as you know, you can no longer be reached on that number. I have left a voicemail on Dan (the SH publicists) phone.
>
> Please forward me your current phone number and contact info, and do give me a call at your earliest convenience. Thank you.

Best,
Gail


Warm Regards
Gail Bleckman
(o) 631. 509. 4397
(c) 631-334-1860

President, Executive Producer
12 Things Productions, LLC.
a New York State Limited Liability Company
GBleckman@aol.com
http://www.imdb.com/name/nm4204317
http://www.linkedin.com/pub/gail-bleckman/10/189/60b

**CIVIL COVER SHEET**

## I. (a) PLAINTIFFS ( Check box if you are representing yourself ☒ )
RYAN KATZENBACH and DIANA MAIOCCO

## DEFENDANTS ( Check box if you are representing yourself ☐ )
GAIL BLECKMAN

**(b) County of Residence of First Listed Plaintiff** Los Angeles
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**County of Residence of First Listed Defendant** Los Angeles
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c) Attorneys** *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.
4935 Beverly Boulevard, Apt 16
Los Angeles, California 90004
323-681-1894

**Attorneys** *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

## II. BASIS OF JURISDICTION (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff
☒ 3. Federal Question (U.S. Government Not a Party)
☐ 2. U.S. Government Defendant
☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multidistrict Litigation - Transfer
☐ 8. Multidistrict Litigation - Direct File

## V. REQUESTED IN COMPLAINT: JURY DEMAND: ☐ Yes ☒ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☐ **MONEY DEMANDED IN COMPLAINT:** $ DECLARATORY

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Complaint for Declaratory Relief in a dispute over copyright infringement allegations and breach of contract concerning a motion picture

## VII. NATURE OF SUIT (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☒ 820 Copyrights |
| ☐ 376 Qui Tam (31 USC 3729(a)) | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 400 State Reapportionment | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 410 Antitrust | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 430 Banks and Banking | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 450 Commerce/ICC Rates/Etc. | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 460 Deportation | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 480 Consumer Credit | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 490 Cable/Sat TV | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 850 Securities/Commodities/Exchange | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 891 Agricultural Acts | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 893 Environmental Matters | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 895 Freedom of Info. Act | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 896 Arbitration | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 220 Foreclosure | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:**   Case Number:   CV16-08060

**CIVIL COVER SHEET**

**VIII. VENUE**: Your answers to the questions below will determine the division of the Court to which this case will be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| QUESTION A: Was this case removed from state court?<br><br>☐ Yes  ☒ No<br><br>If "no," skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | STATE CASE WAS PENDING IN THE COUNTY OF: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | ☐ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | | Western |
| | ☐ Orange | | Southern |
| | ☐ Riverside or San Bernardino | | Eastern |

| QUESTION B: Is the United States, or one of its agencies or employees, a PLAINTIFF in this action?<br><br>☐ Yes  ☒ No<br><br>If "no," skip to Question C. If "yes," answer Question B.1, at right. | **B.1.** Do 50% or more of the defendants who reside in the district reside in Orange Co.?<br><br>*check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| | | ☐ NO. Continue to Question B.2. |
| | **B.2.** Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.)<br><br>*check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION C: Is the United States, or one of its agencies or employees, a DEFENDANT in this action?<br><br>☐ Yes  ☒ No<br><br>If "no," skip to Question D. If "yes," answer Question C.1, at right. | **C.1.** Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.?<br><br>*check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| | | ☐ NO. Continue to Question C.2. |
| | **C.2.** Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.)<br><br>*check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION D: Location of plaintiffs and defendants? | **A.**<br>Orange County | **B.**<br>Riverside or San Bernardino County | **C.**<br>Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☒ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☒ |

| **D.1. Is there at least one answer in Column A?**<br><br>☐ Yes  ☒ No<br><br>If "yes," your case will initially be assigned to the<br>SOUTHERN DIVISION.<br><br>Enter "Southern" in response to Question E, below, and continue from there.<br><br>If "no," go to question D2 to the right. ➡ | **D.2. Is there at least one answer in Column B?**<br><br>☐ Yes  ☒ No<br><br>If "yes," your case will initially be assigned to the<br>EASTERN DIVISION.<br><br>Enter "Eastern" in response to Question E, below.<br><br>If "no," your case will be assigned to the WESTERN DIVISION.<br><br>Enter "Western" in response to Question E, below.  ⬇ |
|---|---|

| QUESTION E: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: ➡ | WESTERN |

| QUESTION F: Northern Counties? | |
|---|---|
| Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? | ☐ Yes  ☒ No |

CV-71 (07/16)                                CIVIL COVER SHEET                                Page 2 of 3

**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES**: Has this action been previously filed **in this court**?    ☒ NO    ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES**: Is this case related (as defined below) to any civil or criminal case(s) previously filed **in this court**?

☒ NO    ☐ YES

If yes, list case number(s): _____

**Civil cases** are related when they (check all that apply):

☐   A. Arise from the same or a closely related transaction, happening, or event;

☐   B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐   C. For other reasons would entail substantial duplication of labor if heard by different judges.

Note: That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**A civil forfeiture case and a criminal case** are related when they (check all that apply):

☐   A. Arise from the same or a closely related transaction, happening, or event;

☐   B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐   C. Involve one or more defendants from the criminal case in common and would entail substantial duplication of labor if heard by different judges.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):**   *[signature]*   DATE: October 27, 2016

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |